**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**
**(SOUTHERN DIVISION)**

| | | |
|---|---|---|
| AEGIS BUSINESS CREDIT, LLC | * | |
| Plaintiff | * | |
| v. | * | Civil Case No. 8:21-cv-00668-AAQ |
| BRIGADE HOLDINGS, INC., *et al.*, | * | |
| Defendants | * | |
| | * | |

**MEMORANDUM OPINION**

This is a case concerning an individual's and a corporation's alleged failure to abide by provisions of a contract requiring them to pay certain amounts of money to another corporation. Pending before the Court is Defendant Brigade Holdings, Inc. and Defendant William Bethell's ("Defendants") Motion to Dismiss.  ECF No. 80.  I have considered Plaintiff Aegis Business Credit, LLC's Response in Opposition, ECF No. 89, as well as Defendants' Reply, ECF No. 91. Also pending before the Court is Plaintiff's Motion to Strike the Affidavit of Defendant Mr. Bethell, which was presented in support of Defendants' Motion to Dismiss.  ECF No. 92.  The parties presented Oral Argument on each of the pending Motions on June 7, 2022.  ECF No. 97. Having considered the aforementioned materials and oral presentation, and for the reasons provided below, Defendants' Motion to Dismiss is DENIED, and Plaintiff's Motion to Strike is GRANTED.

**BACKGROUND**

Plaintiff, Aegis Business Credit, LLC (hereinafter "Plaintiff" or "Purchaser"), is a Florida-based limited liability corporation that, among other things, provides financial assistance to

corporations facing financial difficulties. *See* Aegis Business Credit, Factoring, https://www.aegisbusinesscredit.com/?portfolio=factoring ("Factoring is ideal for [c]ompanies who are in the early stages of growth[;] [o]rganizations who are growing with quality receivables; [s]ituations where, despite overall profitability and increasing sales, the management of receivables and payables is a never-ending juggling act[;] [t]oo much time is spent collecting receivables rather than generating them."). Defendant Brigade Holdings, Inc. (hereinafter "Brigade" or "Seller") is a Delaware-based corporation that, according to its website, "seeks to promote sustainable energy practices . . . through the Design and Sale of energy efficient lighting and control products." Brigade, Mission Statement, http://www.brigadeholdings.com/; *see also* ECF No. 76-1, at 2 ("Defendant Brigade is engaged in, among other things, the design, manufacturing and installation of cost-saving, energy-efficient LED lighting solutions for commercial, industrial, municipal, and nonprofit customers."). According to Plaintiff's Second Amended Complaint, on November 20, 2018, Plaintiff and Defendants entered into a "Factoring and Security Agreement" (the "Agreement").[1] ECF No. 76-1, at 3.

Under the terms of the Agreement, Plaintiff agreed to purchase receivables generated by Brigade's participation in rebate programs regarding the design, manufacture, and installation of LED lights. *Id*. at 3. The sale of such receivables to Plaintiff was a mechanism by which

---

[1] The parties dispute whether the "Factoring and Security Agreement" is, in fact, a factoring agreement. ECF No. 80, at 1 (describing the Agreement as a "usurious Loan Agreement"); ECF No. 89, at 13 ("The Face of the Complaint and Exhibits Attached Thereto Do Not Clearly Establish that the Factoring Agreement is an Express or Implied Loan or an Understanding that the Money Lent Is to be Returned"). I use the term Factoring Agreement not because I necessarily agree with Plaintiff's characterization of the Agreement, but because the Agreement is titled as such and because, for the purposes of a Motion to Dismiss, I am required to accept Plaintiff's well-pleaded allegations as true. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *see also* ECF No. 76-1, at 4 (pleading that the arrangement between the parties "was memorialized in a Factoring and Security Agreement dated November 20, 2018").

Defendants sought to obtain financing for Brigade, which allegedly had been unable to obtain financing from other sources. *Id*. at 2-3. Pursuant to Section 2.4 of the Agreement, the alleged sales of the amounts due would occur as follows:

> [Brigade] shall submit Invoices and Accounts to offer for sale to [Aegis] in accordance with the Agreement. [Aegis] shall then review Invoices and related information to decide whether any of such Invoices and Accounts shall be purchased. [Aegis] may accept or reject any invoice at its sole and absolute discretion, and [Aegis] shall bear the credit risk of nonpayment as a result of an insolvent account debtor for those Invoices and the resulting Accounts. Nothing in this Agreement obligates [Aegis] to purchase any particular invoice.

ECF No. 1-1, at 4. Section 2.1 of the Agreement states that once "[Brigade] sell[s] to [Aegis,]" Plaintiff Aegis shall be "absolute owner, without recourse on those of Seller's Accounts that have been purchased by Purchaser." *Id*. at 3. However, Section 6 of the Agreement notes that the Purchaser shall have full recourse against the Seller for all situations in which non-payment occurs other than those resulting from Account Debtors who become insolvent after the issuance of an invoice purchased by Aegis. *Id*. at 6. Further, Section 8 of the Agreement states that "[u]nless a debtor is insolvent, Purchaser may require that the Seller repurchase by repaying" the amount due to the Purchaser that has not been paid or is otherwise not available to the Purchaser. *Id*. at 6-7.

Section 5 of the Agreement provides that in addition to the charges in cases of non-payment by an Account Debtor, Brigade shall be responsible for additional fees and expenses under the Agreement. *Id*. at 5-6. Among other fees, the Agreement provides for a daily factoring fee that is payable on the tenth of each month; an annual facility fee of $15,000 due on the annual anniversary of the Agreement; and a collateral management fee calculated at .5% of the average funds outstanding, payable on the first day of each month. *Id*. at 5.

Additional charges accrue under the Agreement in the case of a default:

> Upon the occurrence of any Event of Default, in addition to any rights Purchaser has under this Agreement or applicable law, Purchaser may immediately terminate this Agreement, at which time all Obligations shall immediately become due and payable without notice. . . . The Late charge shall accrue and is payable on demand of any obligations not paid when due.

*Id*. at 10.  Section 1.15 of the Agreement provides that the Late Charge shall be "1% for each 10-day period."  *Id*. at 2.

The Agreement includes multiple additional terms relevant to the current dispute between the parties.  First, pursuant to Section 28 of the Agreement, the Agreement and all transactions thereunder are governed by, constructed under, and enforced in accordance with the laws of the State of Florida.  *Id*. at 11.  Second, the Agreement contains multiple provisions relevant to the parties' understanding of the Agreement's nature.  Section 5.12 of the Agreement states that the transactions

> described in the Agreement [are] a true sale of accounts and not a loan.  Notwithstanding the foregoing, in the event that it is determined by a court of competent jurisdiction that the transactions described herein are loans, then regardless of any provision contained in the Agreement or any other agreement or any other agreement or document executed in connection herewith, in no contingency or event whatsoever shall the aggregate of all amounts that are contracted for, charged or received pursuant to the terms of the Agreement or any other documents . . . deemed interest under applicable law exceed the highest permissible rate under applicable law.

*Id*. at 6.  The same provision goes on to note that nothing in the Agreement shall be construed as allowing Plaintiff to charge interest in excess of the amounts allowed under applicable state law, and that if such interest is charged, Brigade stipulates that it shall be the result of a bona fide error. *Id*.  Any amount found to be excess of applicable state law shall then "be applied first to reduce the Obligations and the balance, if any, returned to Brigade, it being the intent of the parties hereto

to not to enter into a usurious or otherwise illegal relationship." *Id*.  Third, Section 2.7 of the Agreement provides that the "[p]urchaser may withhold or offset any [amounts Brigade owes Plaintiff] from the Purchase Price of any Invoice, and may establish such reserves as it determines in its sole discretion from time to time." *Id*. at 4.

In addition to the Agreement, on the same day, Mr. Bethell signed an Indemnification Agreement, under whose terms Mr. Bethell made certain pledges regarding the Factoring and Security Agreement and its performance.  ECF No. 1-3, at 2.  According to the Indemnification Agreement, Mr. Bethell entered into such as a means of inducing Plaintiff to extend "financial accommodations" to Brigade.  *Id*.  Pursuant to the terms of the Indemnification Agreement, Mr. Bethell warranted, among other things, that: 1) "[e]ach Account of Debtor is genuine, valid, subsisting and enforceable in accordance with its terms[;]" 2) "[e]ach Account is accepted by the corresponding Account Debtor, and there are no defenses, setoffs, credits, contra or counter claims against, or disputes with respect to . . . any Account . . .[;]" and 3) "[a]ll services to be performed by Debtor in connection with each Account have been performed by Debtor."  *Id*.  Additionally, by signing the Indemnification Agreement, Mr. Bethell agreed to waive any and all claims arising out of: 1) "[a]ny release, settlement or compromise of any obligations of Debtor[;]" 2) "[t]he invalidity or unenforceability of the Obligations[;]" and 3) "[t]he filing of an insolvency proceeding by or against Debtor."  *Id*.

On January 31, 2019, the parties entered into an Amendment to the Factoring Agreement allowing Defendants to obtain additional funding to purchase inventory.  ECF No. 76-1, at 7.  The Amendment allowed Plaintiff "to make advances up to $300,000 or 50% of the purchase price of [the inventory obtained with Brigade's financing]."  *Id.*  If Plaintiff advanced funds to Brigade for specified inventory, all such inventory had to be "located in locations where the owner of such

location shall have entered into a landlord's or warehousemen's waiver in favor of [Plaintiff] . . . [Further, Brigade] shall not sell, encumber, or dispose of or permit the sale, encumbrance or disposal of any Inventory without [Plaintiff]'s prior written consent." *Id.* at 52.

From 2019 to 2020, pursuant to the Agreement and the Amendment to the Agreement, Plaintiff purchased receivables from Brigade and financed Brigade's purchases of inventory. *Id.* at 7. During this time frame, Brigade engaged in a significant project to install LED lighting at Dwight D. Eisenhower Junior High School for utility provider Baltimore Gas & Electric Company ("BGE"). *Id.* at 8-9. For this project, Brigade expected to be paid around $180,000 under an available rebate program. *Id.* at 10. As a result of that expected payment, and on the basis of information Brigade provided stating an inventory valuation of $779,931, Plaintiff continued to fund Brigade's purchase of inventory under the Amendment to the Agreement. *Id.* at 7-8.

In April 2020, the relationship between the parties soured, as Plaintiff alleges Defendants breached the Agreement, as well as the Amendment to the Agreement, by "refusing to provide required financial reporting" and "refusing to allow an inventory inspection." *Id.* at 9. According to Plaintiff, it reserved its rights and chose not to pursue available remedies under the Agreement as it attempted to resolve its disputes with Defendants. *Id.* at 9-10. However, on August 13, 2020, Mr. Bethell relayed to Plaintiff that: Brigade had ceased doing business; Brigade would not be providing additional reporting as the Agreement requires; and he did not know the location of collateral securing the Agreement. *Id.* at 10-11. Plaintiff alleges Brigade, at Mr. Bethell's direction, used the inventory Plaintiff financed on jobs not disclosed to Plaintiff and then reduced it to cash, which Brigade collected. *Id.* at 11. Plaintiff also alleges Mr. Bethell directed rebates due to Plaintiff to instead be remitted to the Internal Revenue Service for the resolution of unpaid federal income taxes. *Id.*

6

On March 17, 2021, Plaintiff filed suit against Mr. Bethell and Brigade, as well as four other Defendants: BGE, ICF International Inc., the United States, and Veterans Storage, Inc.  ECF No. 1, at 1-2.  Plaintiff attached to its Complaint, the Factoring Agreement, ECF No. 1-1; a financing statement pursuant to the Uniform Commercial Code, ECF No. 1-2; the Indemnification Agreement, ECF No. 1-3; a letter from Plaintiff to BGE dated August 17, 2020, advising it that all accounts of Brigade had been assigned to it instead and thus all remittances owed to Brigade were owed to Plaintiff instead, ECF No. 1-4; and a letter from counsel for Plaintiff to Mr. Bethell dated August 24, 2020, informing him that Brigade was in default of the Agreement.  ECF No. 1-5.  On June 28, 2021, Plaintiff voluntarily dismissed its claims against ICF International Inc. and BGE.  ECF No. 38.  On September 21, 2021, Plaintiff voluntarily dismissed its claims against Veterans Storage, Inc., as well.  ECF No. 63.

On November 19, 2021, Plaintiff filed a Consent Motion for Leave to File a Second Amended Complaint.  ECF No. 76-1.  Therein, Plaintiff asserts a series of claims against Brigade and Mr. Bethell including: (i) breach of contract; (ii) fraud and intentional misrepresentation; (iii) concealment and deceit; and (iv) fraudulent inducement.  *Id.* at 12-28.  Plaintiff also brings claims for tortious interference with contract against Mr. Bethell and a claim for conversion against Brigade.  *Id.* at 24-26.  Plaintiff attached to its Second Amended Complaint each of the exhibits it previously submitted, but also the Amendment to the Agreement and an agreement between Brigade and BGE related to the Eisenhower school project.

On December 3, 2021, Defendants filed their Motion to Dismiss.  ECF No. 80.  In support of their motion, Defendants presented various exhibits, including 1) the "Factoring and Security Agreement", ECF No. 80-1; 2) the Indemnification Agreement included with Plaintiff's original Complaint, ECF No. 80-3; 3) the previously referenced letter from Plaintiff to Brigade Holdings

and Mr. Bethell dated August 24, 2020 notifying the Defendants that they were in breach of the Agreement, ECF No. 80-4; 4) an email dated April 5, 2019 providing Mr. Bethell and Brigade a statement of amounts owed pursuant to the Agreements, ECF No. 80-5; 5) an affidavit from Mr. Bethell presenting facts regarding the dispute between the parties and seeking to authenticate the other exhibits, ECF No. 80-6; 6) an affidavit from Defendants' counsel providing descriptions of the other external materials, as well as presenting interpretations and arguments related to the substance of the materials, ECF No. 80-7; and 7) a 141-page compilation of monthly statements from Plaintiff to Brigade, electronic mail communications related to such statements, and an unsourced chart which presumably Defendants or their counsel created to present in support of their argument, ECF No. 80-8.

On January 17, 2022, Plaintiff filed its Response in Opposition to Defendants' Motion to Dismiss.  ECF No. 89.  On February 4, 2022, Defendants filed a Reply in Support of their Motion to Dismiss.  ECF No. 91.  On February 15, 2022, Plaintiff moved to strike the affidavit from Mr. Bethell filed in support of Defendants' Motion to Dismiss.  On April 29, 2022, this case was transferred to my chambers for all further proceedings.  On June 7, 2022, the parties presented Oral Argument on the pending Motions.  ECF No. 97.

**STANDARD OF REVIEW**

Fed. R. Civ. P. 12(b) provides that a party may move to dismiss where the Plaintiff has "fail[ed] to state a claim upon which relief can be granted."  When ruling on a motion to dismiss, the court considers whether a complaint contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp v. Twombly*, 550 U.S. 544, 570 (2007)).  The court will consider whether the plaintiff has pled factual content allowing reasonable inferences to be drawn that the

defendant is "liable for the misconduct alleged." *Id.* The plaintiff need not plead facts that are probable, but must present facts showcasing more than a "sheer possibility" that the conduct perpetuated by a defendant is unlawful. *Id.* The plaintiff has an obligation to provide more than "a formulaic recitation of the elements of a cause of action." *Twombly,* 550 U.S. at 555. Pleadings that present "no more than conclusions" will not be "entitled to the assumption of truth." *Iqbal,* 556 U.S. at 679.

When considering a motion to dismiss pursuant to Rule 12(b)(6), the court may not consider extrinsic evidence unless the motion to dismiss is converted into one for summary judgment. Fed. R. Civ. P. 12(d).   The court should not make such a conversion where the parties are not given notice and are not afforded the opportunity to conduct reasonable discovery. *Carter v. Baltimore Cty., Maryland,* 39 Fed.Appx. 930, 932-33 (4th Cir. 2002). There are a few limited exceptions to this rule – extrinsic evidence may be considered where documents attached to a motion to dismiss are integral to the complaint. *Anand v. Ocwen Loan Servicing, LLC*, 754 F.3d 195, 198 (4th Cir. 2014). However, the authenticity of such documents must not be in dispute. *Id.* The court may also take judicial notice of certain facts outside of the complaint, but only if they can be "accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201.

## ANALYSIS

Although Defendants frame their Motion to Dismiss as raising three separate arguments, the primary argument underlying Defendants' Motion is that the Factoring and Security Agreement, which allegedly is the basis for all of Plaintiff's claims, was a usurious loan agreement, in violation of Florida law. *See* ECF No. 80, at 1. Specifically, Defendants assert Plaintiff has violated Florida's usury laws by charging, with the requisite corrupt intent, a 53 percent per annum

interest rate under the Agreement's terms.  *Id*. at 6-27.  Florida Statutes provide that a contract is usurious if the effective interest rate exceeds 18 percent per annum for loans under $500,000 and is criminally usurious for any loan with an effective interest rate that exceeds 25 percent per annum.  Fla. Stat. §§§ 687.02(1), 687.03(1), 687.071. Under Florida law, a criminally usurious loan is not enforceable.  Florida Statute § 687.071 ("No extension of credit made in violation of any of the provisions of this section shall be an enforceable debt in the courts of this state."); *Velletri v. Dixon*, 44 So.3d 187, 192 (Fla. Dist. Ct. App. 2010) ("When a debt is criminally usurious, the remedy is cancellation of the debt itself and any amounts paid.").  Accordingly, Defendants argue that all claims in Plaintiff's Complaint, because they allegedly arise out of the allegedly invalid Agreement's breach, must be dismissed.  *See* ECF No. 80, at 6-27.

An allegation that a contract is usurious does not automatically invalidate a contract, rather it is an affirmative defense that a defendant may plead in response to a claim against it.  *See Gunn Plumbing, Inc. v. Dania Bank*, 252 So.2d 1, 4 (Fla. 1971) ("The usury statute in this State does not have the effect of invalidating contracts for interest at a rate higher than the statutory maximum, but only accords to the obligor the privilege of setting up, or waiving, affirmative defenses of usury in respect to such contracts.").

At the motion to dismiss stage, a plaintiff is not obligated to present facts addressing affirmative defenses that a defendant may have.  *See CX Reinsurance Co. Ltd., v. Leader Realty Co.*, 219 F.Supp.3d 542, 546 (4th Cir. 2016) (holding a plaintiff has no duty to plead facts to negate affirmative defenses).  "A motion under Rule 12(b)(6) is intended to test the legal adequacy of the complaint, and not to address the merits of any affirmative defenses."  *Richmond, Fredericksburg & Potomac R. Co. v. Forst*, 4 F.3d 244, 250 (4th Cir. 1993).  Generally, a court may only reach the merits of an affirmative defense when ruling on a motion to dismiss "if all facts necessary to

10

the affirmative defense clearly appear on the face of the complaint." *Demetry v. Lasko Prod., Inc.*, 284 F.App'x 14, 15 (4th Cir. 2008) (quoting *Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007)); *CompuSpa, Inc. v. Int'l Bus. Mach. Corp.*, 228 F.Supp.2d 613, 625 (D. Md. 2002) (holding it inappropriate to consider affirmative defense at the motion to dismiss stage where the asserted defense of privilege did not appear on the face of the complaint).

Recognizing such, Defendants rely on a range of materials beyond those attached to or explicitly referenced in the Complaint. Defendants defend the inclusion of these materials on two alternate bases. First, Defendants argue that all of the materials they have included are integral to the Complaint, and thus must be considered with a Motion to Dismiss. ECF No. 91, at 1. Alternatively, Defendants argue that even if I find that the materials are not integral to the Complaint, I should convert their Motion to Dismiss to a Motion for Summary Judgment and consider the materials as a result. *Id.* at 4-5. I consider the alternative arguments below, as well as the impact of my determination regarding each on Defendants' pending Motion.

## I.     Many of the Materials Presented in Support of the Motion to Dismiss May Not Be Considered at This Stage of the Case.

As noted, Defendants' Motion to Dismiss relies on a range of materials including affidavits from Defendants' counsel and Mr. Bethell explaining the impact of the Agreement's terms on Defendants; monthly statements from Plaintiff to Brigade; electronic mail communications between Plaintiff and Brigade; and a chart supporting the asserted defense of usury.

As noted, generally, "a court may not consider extrinsic evidence at the 12(b)(6) stage." *Chesapeake Bay Found., Inc. v. Severstal Sparrows Point, LLC*, 794 F.Supp.2d 602, 611 (D. Md. 2011). If, however, "a defendant attaches a document to its motion to dismiss, 'a court may consider it in determining whether to dismiss the complaint [if] it was integral to and explicitly relied on in the complaint and [if] the plaintiffs do not challenge its authenticity.'" *Id.* (alterations

11

in original) (quoting A*m. Chiropractic Ass'n, Inc. v. Trigon Healthcare Inc.*, 367 F.3d 212, 234 (4th Cir. 2004)).  An integral document is a one that by its "very existence, and not the mere information it contains, gives rise to the legal rights asserted." *Walker v. S.W.I.F.T. SCRL*, 517 F.Supp.2d 801, 806 (E.D. Va. 2007).  In the event that any properly considered extra-pleading materials conflict with the "bare allegations of the complaint," the extra-pleading materials "prevail." *Fare Deals Ltd. v. World Choice Travel.Com, Inc.*, 180 F.Supp.2d 678, 683 (D. Md. 2001) (citing *Fayetteville Inv'rs v. Commercial Builders, Inc.*, 936 F.2d 1462, 1465 (4th Cir. 1991)).

Defendants correctly note that a court may consider documents that are integral to a Complaint at the motion to dismiss stage.  ECF No. 91, at 2.  Defendants rely on the Second Circuit's definition of integral – any document whose "terms and effect" were "heavily" relied upon when drafting the Complaint – in support of their argument.  *Id*.  (citing *Chambers v. Time Warner, Inc*., 282 F.3d 147, 153 (2d Cir. 2002)); *see also Miller v. Bright Key, Inc.*, No. JKB-21-0995, 2021 WL 3129635, at *4 (D. Md. July 22, 2021) (applying *Chambers* to determine whether a document was integral to the Complaint).  However, an examination of *Chambers* reveals that it fails to support consideration of all the materials Defendants have attached to their Motion.  In *Chambers*, plaintiffs, who were recording artists, alleged that defendant record companies had violated federal copyright laws.  *Id*. at 149-50.  Plaintiffs, whose claims had been dismissed by the district court, alleged that the trial court improperly considered contracts between the parties and unsigned drafts of a collective bargaining agreement between record producers and the American Federation of Television and Radio Artists, to which plaintiffs in that case belonged.  *Id*. at 151-152.  While the Second Circuit found that the contract between the parties could be considered because it was integral to the Complaint, "the [unsigned Agreement] w[as] not part of the Amended

Complaint.  Further, the parties disagree[d] as to whether and how the [unsigned Agreement] relate[d] to or affect[ed] the contractual relationships at issue." *Id*. at 154.

The Fourth Circuit's application of *Chambers* further supports the conclusion that many of the materials Defendants cite are not integral to the Complaint.  Applying *Chambers*, the Fourth Circuit, as well as courts in this District have stated that citation or quotation of a document will be insufficient unless the plaintiffs' claims "turn on or otherwise depend on" statements contained in the extrinsic document.  *Gordon v. Cigna Corporation*, No. GJH-17-2835, 2018 WL 3375099, at *2 (D. Md. July 11, 2018) (citing *Goines v. Valley Cmty. Servs*. Bd., 822 F.3d 159, 166 (4th Cir. 2016)).  "Courts in this Circuit have reasoned that an integral document is one that by its 'very existence,' and not the mere information it contains, gives rise to the legal rights asserted." *Gordon*, 2018 WL 3375099, at *2 (quoting *Chesapeake Bay Found., Inc. v. Severstal Sparrows Point, LLC*, 794 F.Supp.2d 602, 611 (D. Md. 2011)).  Applying these rules, "[c]ourts have found integral the allegedly fraudulent document in a fraud action, the allegedly libelous magazine article in a libel action, and the documents that constitute the core of the parties' contractual relationship in a breach of contract dispute." *Id*.

Accordingly, the Factoring Agreement, the UCC Financing Statement, the Indemnification Agreement and the Amendment to the Agreement between the parties – which create the rights that Plaintiff seeks to enforce in this case – are integral to the Complaint.  Additionally, Plaintiff's Second Amended Complaint includes as an attachment and explicitly references Exhibit 4 to Defendants' Motion to Dismiss – an August 24, 2020, letter from Plaintiff to Brigade, discussing its terms and demands.  *See* ECF No. 76-1 at 12 ("Aegis notified Brigade of defaults under the Factoring Agreement and demanded that Brigade perform as promised and surrender the Collateral to Aegis."); *Gordon*, 2018 WL 3375099, at *2 (considering a letter from defendants to plaintiffs

which plaintiffs, in their complaint, described in detail and quoted extensively from).  Accordingly, such material is properly considered at the motion to dismiss stage.

However, consideration of the email communications between the parties allegedly demanding payments under the Agreement, ECF No. 80-5; the affidavit from Mr. Bethell verifying, among other things, the amounts due under the Agreement, ECF No. 80-6; the affidavit of Defendants' counsel testifying as to the meaning and impact of the documents, ECF No. 80-7; and the compilation of monthly summary statements and an independently created chart explaining the meaning and impact of the Agreement, ECF No. 80-8, would not be proper.  These materials do not create the rights which Plaintiff seeks to enforce in this case nor are they "explicitly referenced" in the Complaint, and in the case of some of them, appear to have been created explicitly for the purpose of litigation.[2]  Were the Court to accept Defendants' argument that all of the materials it has submitted are integral, it would mean that at the motion to dismiss stage of a breach of contract claim, a court could conduct a broad inquiry into the performance of a contract. This would essentially merge the inquiry at the motion to dismiss stage with that at the motion for summary judgment stage, as both parties could freely submit external documents, testimony from the parties, and even opinions from third parties evidencing their interpretation of the document.

Nor are these materials, as Defendants argue, proper subjects for judicial notice.  As Defendants note, a court may take judicial notice of "facts that are either generally known, or facts that 'can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.'"  ECF No. 91, at 2 (quoting Fed R. Civ. P. 201(b)).  This includes, for example,

---

[2] That said, I may consider the affidavit of Defendants' counsel as supplemental briefing from Defendants in support of their position, but cannot treat it as evidence or accept the allegations therein as necessarily correct, particularly if unsupported by evidence that is appropriately considered at this stage of the case.

matters of public record. *Sher v. Luxury Mortgage Corp.*, No. ELH–11–3656, 2012 WL 5869303, at *7 (D. Md. Nov. 19, 2012). The information in electronic mail communications between the parties, monthly statements, or affidavits presenting the parties' interpretation of the documents are neither facts that are generally known, nor facts from sources whose accuracy cannot be reasonably questioned. The details of how much a party charged another under a contract are not "publicly known facts." Likewise, the materials, at issue, were not available from a source whose reliability cannot be questioned, but rather were made available, and in some cases created, by one of the parties in the litigation, thus excluding them from the second category, as well. *See United States v. Doe*, 962 F.3d 139, 147 (4th Cir. 2020) (taking judicial notice of a 2016 report by the Committee on Court Administration and Case Management of the Judicial Conference of the United States ("CACM Report")).

My decision, at this stage, to refrain from considering Exhibits 5-8 in support of Defendants' Motion to Dismiss is consistent with that of other courts in the Fourth Circuit considering similar materials. *Compare Anand*, 754 F.3d at 198 (considering, upon a motion to dismiss, a Deed of Trust in a case in which plaintiffs alleged that defendants had defaulted on a promissory note secured by the Deed of Trust) and *Akhmedov v. State of Maryland Dep't of Pub. Safety and Corr. Servs*, No. ELH-15-00226, 2015 WL 6783182, at *13 (D. Md. Nov. 6, 2015) (finding that affidavit recounting investigation of plaintiff's allegations of discrimination was not integral to complaint and thus would not be considered at the motion to dismiss stage).

Importantly, I make no determination regarding the relevancy, authenticity, or ultimate impact of these documents on Defendants' asserted affirmative defense. In fact, at a later stage of the case, it is possible that they may be considered as to whether Defendants have established an

affirmative defense that the Agreement is usurious and, thus, that claims arising out of its breach cannot succeed.

## II.     It Would Be Improper to Convert Defendants' Motion to Dismiss to a Motion for Summary Judgment Given the Unconducted Discovery, as Well as the Lack of Notice to Plaintiff.

Alternatively, Defendants argue that even if the Court does not consider each of the extrinsic materials they have presented, the Court should convert their Motion to Dismiss to a Motion for Summary Judgment and consider these materials regardless.  ECF No. 91, at 4.  As an initial matter, I note that Defendants raise this argument, in passing, and accordingly, I need not consider it here.  *Grayson O Co. v. Agadir Int'l LLC*, 856 F.3d 307, 316 (4th Cir. 2017).  Regardless, as discussed below, even properly considered, conversion of the Motion to Dismiss would be inappropriate.

A court cannot convert a motion to dismiss to one for summary judgment "unless it gives notice to the parties that it will do so."  *Wells-Bey v. Kopp*, No. ELH-12-2319, 2013 WL 1700927, at *6 (D. Md. Apr. 16, 2013) (citing *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 261 (4th Cir. 1998)).  This may be accomplished where the movants "expressly [caption] their motion 'in the alternative' as one for summary judgment, and [submit] matters outside the pleadings for the court's consideration."  *Id*.  Once that is done, the parties are on notice that conversion may take place under Fed. R. Civ. P. 12(d).  *Id*.  In this case, Defendants did not caption their Motion to Dismiss, in the alternative as a Motion for Summary Judgment; nor did their initial Motion to Dismiss otherwise give notice that they intended to ask the Court to convert their Motion.  ECF No. 80.  Rather, they raised the issue for the first time in their Reply.  ECF No. 91, at 4-5.  Accordingly, insufficient notice was given.  Although Defendants separately note that Plaintiff was on notice of the extrinsic documents, *id*. at 4, this argument confuses the relevant question –

16

whether Plaintiff had notice of the intent to convert the motion, not notice of the documents in dispute.  The distinction is important because notice of the intent to convert gives Plaintiff the opportunity to present arguments as to why additional discovery is needed before a decision on summary judgment occurs.

Along these lines, even if notice has been given, summary judgment is inappropriate if there has not been an "opportunity for reasonable discovery." *Sanders v. Callender*, No. DKC-17-1721, 2019 WL 3717868, at *2 (D. Md. Aug. 6, 2019) (quoting *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435,448 (4th Cir. 2011)).  The court must deny a motion for summary judgment or delay ruling on the motion if, per Fed. R. Civ. P. 56(d) the "nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify the opposition."  Fed. R. Civ. P. 56(d).  The Fourth Circuit places a large degree of weight on a Rule 56(d) affidavit presented in opposition to a request to convert a motion to dismiss.  *See Evans v. Technologies Applications & Service Co.*, 80 F.3d 954, 961 (4th Cir. 1996) ("We, like other reviewing courts, place great weight on the Rule 56(f) affidavit . . .").  However, failing to file a Rule 56(d) affidavit is not necessarily fatal where the "nonmoving party has adequately informed the district court that the motion is premature and that more discovery is necessary." *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244-45 (4th Cir. 2022).

As noted above, in this case, Defendants provided insufficient notice to Plaintiff of their intent to convert the motion – thus, precluding them from the opportunity to file a Rule 56(d) affidavit regarding additional matters on which discovery is needed.  Regardless, Plaintiff has sufficiently informed the Court of such.  For example, Plaintiff has asserted that additional discovery is needed regarding the parties' intent at the inception of the Agreement, ECF No. 89, at 2 n.2; the parties' respective understandings of the nature of the Agreement when made, *id.* at

18; whether Plaintiff knew the Agreement violated Florida law, *id*. at 27; and whether indemnification and guaranty agreements are customary under Florida law. *Id*.

Accordingly, for each of the aforementioned reasons, I find that conversion of Defendants' Motion to Dismiss would be improper.

### III. Defendants Have Failed to Establish the Asserted Affirmative Defense at the Motion to Dismiss Stage.

Having determined that consideration of the electronic communications, monthly statements, the affidavits, and the summary chart provided would be improper, I must determine, based on the Complaint and the remaining exhibits, whether dismissal of Plaintiff's Complaint is appropriate.

Florida's criminal and civil usury law is codified at Fla. Stat. § 687 *et seq*. ("No extension of credit made in violation of any of the provisions of this section shall be an enforceable debt in the Courts of this state."). Based on the statute, usury requires proof of four elements: "(1) an express or implied loan; (2) an understanding between the parties that the money lent is to be returned; (3) an agreement to pay a greater rate of interest than the law allows; and (4) a corrupt intent to take more than the allowable legal rate of interest for the use of the loaned money." *In re Vision Dev. Grp. of Broward Cty., LLC*, 411 B.R. 768, 772 (Bankr. S.D. Fla. 2009) (applying Florida law). "It is well-settled that the determination of whether a transaction is either civilly or criminally usurious is made at the inception of the loan." *World O World Corp. v. Patino*, 306 So.3d 1044, 1046 (Fla. Dist. Ct. App. 2020). For the purposes of Defendants' Motion to Dismiss, the parties dispute whether the first, third, and fourth elements are clearly apparent from the face of the Complaint and attached documents.[3]

---

[3] Plaintiff, in passing, notes that for the same reason the Agreement is not a loan, the second element of the test has not been satisfied. ECF No. 89, at 18-19. As neither party addresses the

### A.  It Is Unclear if the Factoring Agreement is a Loan.

Some courts have held that a "sale of accounts receivable . . .  at a discounted price," *In re Metro. Envtl., Inc.*, 293 B.R. 893, 895 (Bankr. N.D. Ohio 2003), can be a "sale" and not a loan subject to laws prohibiting usury.  *See Korrody v. Miller*, 126 S.W.3d 224, 226 (Tex. App. 2003); *Carter v. Four Seasons Funding Corp.*, 97 S.W.3d 387 (2003); *Boerner v. Colwell Co.*, 577 P.2d 200 (1978).  Under a factoring agreement, "[a] factor buys accounts receivable at a discount, the factor's seller obtains immediate operating cash, and the factor profits when the face value of the account is collected."  *Carter*, 97 S.W.3d at 395–96.  That said, "commercial transactions are complicated, and the determination of whether a transfer of interest in accounts receivable is truly a 'sale' or whether the payment of the 'purchase price' is in reality a 'loan,' requires a close look at the details of the transaction."  *In re Burm*, 554 B.R. 5 (Bankr. D. Mass. 2016).  As one court noted, "[a]ccounts receivable financing is an uncertain area in the usury law and no exact tests have been formulated."  *Baruch Inv. Co. v. Huntoon*, 257 Cal.App.2d 485, 492 (Ct. App. 1968).  Accordingly, other courts have held – albeit upon a more complete record than is available here – that a sale of accounts was, in fact, a loan.  *See Major's Furniture Mart, Inc. v. Castle Credit Corp., Inc.*, 602 F.2d 538, 546 (3rd Cir. 1979) ("Accordingly, we hold that on this record the district court did not err in determining that the true nature of the transaction between Major's and Castle was a secured loan, not a sale."); *In re Qualia Clinical Service, Inc.*, 441 B.R. 325, 330 (B.A.P. 8th Cir.) aff'd, 652 F.3d 933 (8th Cir. 2011) ("This agreement, which shifts all risk to Qualia, is a disguised loan rather than a true sale.") (internal quotation marks omitted).

---

point in any detail and the determination is not necessary to decide Defendants' Motion to Dismiss, I do not address the point in this Opinion.

When determining the true nature of an agreement, Florida courts look to the substance of a transaction and not solely the form or designation given to it by the parties. *L'Arbalete, Inc. v. Zaczac*, 474 F.Supp.2d 1314, 1324 (S.D. Fla. 2007); *Pinchuck v. Canzoneri*, 920 So.2d 713 (Fla. Dist. Ct. App. 2006) ("the concealment of the needle of usury in a haystack of subterfuge will not avail to prevent its pricking the body of law into action"). "[A] finding of usury depends on the intent and understanding of the parties." *Oregrund Limited Partnership v. Shieve*, 873 So.2d 451, 457 (Fla. Dist. Ct. App. 2004). "A transaction that is entirely or partially in the form of a sale, may be usurious when the intent is to make a loan of money for greater profit than allowed by statute." *Id.*

Florida courts have approved the consideration of various factors in determining whether an agreement is a loan, including, but not limited to: 1) whether the agreement required an assignment of commercial paper; 2) whether the alleged lender withheld a discount and/or reserve; 3) whether the reserve would be repaid once the paper was paid in full; 4) whether the agreement required the borrower to repurchase any defaulted paper; 5) the degree of recourse that a lender has in case of a default; and 6) whether individual stockholders of the borrower guaranty the transaction at issue. *See W.B. Dunn Co., Inc. v. Mercantile Credit Corp.*, 275 So.2d 311, 316 (Fla. Dist. Ct. App. 1973) (citing with approval the application of the aforementioned factors in determining whether the sale of contracts was a loan); *see also Endico Potatoes, Inc. v. CIT Group/Factoring, Inc.*, 67 F.3d 1063, 1068 (2d Cir. 1995) (identifying factors relevant to determining whether a party was a "bona fide purchaser": "the right of the creditor to recover from the debtor any deficiency if the assets assigned are not sufficient to satisfy the debt, the effect on the creditor's right to the assets assigned if the debtor were to pay the debt from independent funds, whether the debtor has a right to any funds recovered from the sale of assets above that necessary

to satisfy the debt, and whether the assignment itself reduces the debt"). Although there appears to be some variance among tests that various courts have applied, an important factor is the degree of risk that the contracts' purchaser bears. *See Craton Entertainment, LLC v. Merchant Capital Group, LLC*, 314 So.3d 627 (Fla. Dist. Ct. App. 2021) (citing several Florida cases holding that where the purchaser of accounts bears risk the transaction may not be usurious); *Endico Potatoes*, 67 F.3d at 1069 ("The root of all of these factors is the transfer of risk.").

### 1. By Itself, the Transfer of Risk Is Not Determinative at the Motion to Dismiss Stage.

As Defendants emphasize, under the terms of the Agreement, Plaintiff has various means of recourse against Brigade if an entity owing payment pursuant to a purchased account fails to pay, unless the entity owing money becomes insolvent. ECF No. 80, at 12. Under any of these circumstances, Plaintiff may require that Brigade repurchase the Account. *Id*. Additionally, Defendants emphasize that pursuant to Section 2.7 of the Agreement, Plaintiff retains the discretion to increase the amount of payment that it withholds from Brigade, thereby protecting Plaintiff in case an entity owing money fails to pay after Plaintiff purchases the contract. *Id*. at 13. Accordingly, Defendants argue that, under the terms of the Agreement, Plaintiff retains the discretion to ensure that Defendants alone bear any risk for non-payment, even in cases of insolvency. *Id*. at 14. Furthermore, Defendants posit that Mr. Bethell has agreed to indemnify Brigade for any payments it fails to make. ECF No. 91, at 7. This combination of provisions, Defendants argue, ensure that Plaintiff actually bears no risk under the Agreement's terms, thereby converting the Agreement to nothing more than a secure loan. *Id*. at 6. Decisions from the Second, Third, and Eighth Circuits provide support for Defendants' position:

> The root of all of these factors is the transfer of risk. Where the lender has purchased the accounts receivable, the borrower's debt is extinguished and the lender's risk regarding the performance of the

21

> accounts is direct, that is, the lender and not the borrower bears the
> risk of non-performance by the account debtor.  If the lender holds
> only a security interest, however, the lender's risk is derivative or
> secondary, that is, the borrower remains liable for the debt and bears
> the risk of non-payment by the account debtor, while the lender only
> bears the risk that the account debtor's non-payment will leave the
> borrower unable to satisfy the loan.

*Endico Potatoes*, 67 F.3d at 1069.  *See Major's Furniture Mart,* 602 F.2d at 546 ("It is apparent

to us that on this record none of the risks present in a true sale is present here."); *In re Qualia*, at

330 ("Where the seller retains virtually all of the risk of non-collection, the transaction cannot

properly be considered a true sale.").

Plaintiff responds to Defendants' arguments regarding the impact of the recourse

provisions by raising two arguments.  First, Plaintiff argues that some of the cases on which

Defendants rely do not depend on Florida law.  ECF No. 89, at 15.  While this is true, the cases on

which Plaintiff relies, concluding that a factoring agreement may exist where the purchaser has

recourse against the seller, likewise do not depend on Florida law.  *Id*. at 16-17 (citing *Carter v.

Four Seasons Funding Corp.*, 97 S.W.3d 387 (Ark. 2003); *Express Working Cap., LLC v. Starving

Students, Inc.*, 28 F. Supp. 3d 660, 670 (N.D. Tex. 2014)).[4]  Second, and more persuasively,

Plaintiff notes that these cases did not establish that a factoring agreement could be deemed a loan,

at the motion to dismiss stage, based on only the "substantial recourse" available to the purchaser

against the seller.  ECF No. 89, at 18; *see Major's Furniture Mart*, 602 F.2d at 544 ("The comments

---

[4] Although Plaintiff notes that *Carter* was cited by the Third District Court of Appeals of Florida
in *Finlay Clinics, Inc. v. Abacus Health Sys.*, Inc., 895 So. 2d 1262, 1263 (Fla. Dist. Ct. App. 2005)
in support of the conclusion that the agreements at issue were not loans, it is not clear what the
basis for the decision in *Finlay* was.  The entirety of the *Finlay* court's ruling was: "We affirm the
decision below that the transactions in question were, as a matter of law, not loans of money to
which usury statutes could apply."  *Id*.

to 9-502(2) (and in particular Comment 4) make clear to us that the presence of recourse in a sale agreement without more will not automatically convert a sale into a security interest."); *In re Qualia Clinical Serv.*, 441 B.R. at 332 (affirming bankruptcy court's grant of summary judgment). While I agree that the cases are clear that there is no *per se* rule that the presence of "substantial recourse" automatically converts a factoring agreement into a loan, case law – including that from Florida – is clear that the presence of recourse and the amount thereof may be a relevant factor.

### 2. Defendants' Remaining Arguments Are Insufficient to Establish, at the Motion to Dismiss Stage, That the Agreement is a Loan.

In their Reply, Defendants note that their argument is not based solely on the degree of recourse available to them, but the fact that: 1) the Indemnification Agreement refers to the Factoring Agreement as a "credit agreement" and Brigade as a Debtor; 2) the amount that Brigade owes Plaintiff for any unpaid average daily outstanding line balance for the month fluctuates based on the Prime Rate as published periodically in the Wall Street Journal; 3) the Agreement requires that collections sent by account debtors are sent to a bank account in Brigade's name from which Brigade plays Plaintiff; 4) Brigade is appointed as Servicing Agent for collection of the accounts; and 5) the Amendment to the Agreement provides for the provision of additional funding secured by inventory purchased with this additional financing.[5]  ECF No. 91, at 11-12.

Plaintiff, likewise, argues that various other terms of the Agreement support the conclusion that it is a factoring agreement.  Namely, Plaintiff, in its sole discretion, determines whether and

---

[5] Defendants' argument is further undercut by the fact that these points were raised for the first time in Defendants' Reply in Support of their Motion to Dismiss.  *Clawson v. Fedex Ground Package System, Inc.*, 451 F.Supp.2d 731, 734 (D. Md. 2006) ("The ordinary rule in federal courts is that an argument raised for the first time in a reply brief or memorandum will not be considered. . . . However, the power to decline consideration of such arguments is discretionary, and courts are not precluded from considering such issues in appropriate circumstances.") (internal citations omitted).

which invoices it shall purchase; Plaintiff is not obligated to purchase any particular invoice; and if Brigade fails to perform the necessary work creating a right to collect payment, Plaintiff will be unable to purchase that right.  ECF No. 89, at 14.  Plaintiff also argues that the amount and timing of repayments, including any fees in case of breach, are not certain.  *Id*.  Rather, payments depend on when and if Plaintiff purchased invoices, the Account Debtors' repayment of the purchased invoices and the timing thereof, and whether an Account Debtor became insolvent after Plaintiff purchased its invoice.  *Id*.  Finally, the Factoring Agreement states that Plaintiff and Brigade intend that the transactions are "to be a 'true sale' of accounts and not a loan."  *Id*.  Although the parties' description of the Agreement is not determinative, the inclusion of such language is particularly relevant at the motion to dismiss stage where limited other evidence is available regarding the parties' intent at the inception of the agreement.

Given the conflicting provisions of the Agreement, the high standard Defendants must presently meet, the limited record that I may consider at this stage, and the types of information courts have considered in determining whether an Agreement is a loan, as opposed to a factoring agreement, I cannot conclusively determine at this point whether the Agreement constituted a loan or a factoring Agreement.  *Major's Furniture Mart,* 602 F.2d at 545 ("Hence it appears that in each of the cases cited, despite the express language of the agreements, the respective courts examined the parties' practices, objectives, business activities and relationships and determined whether the transaction was a sale or a secured loan only after analysis of the evidence as to the true nature of the transaction.").

### B.  It Is Unclear Whether the Agreement Allows Plaintiff to Charge Interest at a Rate Greater Than the Law Allows.

As noted above, the Agreement allows Plaintiff to charge Brigade various fees and charges. As an initial matter, because the Complaint, the Agreement and the other materials I can consider

are ambiguous as to the amount of receivables that Plaintiff purchased under the Agreement and the amount of inventory that Plaintiff financed, it is unclear what the principal is relative to any interest charged.  Accordingly, the impact of the wire transfer fee ($25), the annual facility fee ($15,000), the documentation fee ($500), the correction fee for incorrect invoices ($100), the waiver fee ($500), the adjustment fee ($100), and the rush request fee ($100) cannot be, at this point, determined.  Although relatively small by themselves, the combination of the fees may be relevant to the ultimate determination as to whether the interest rate is unlawful depending on the size of the principal.

Defendants, relying on the monthly statements and the affirmation from their counsel, argue that Plaintiff charged more than the 25 percent maximum allowable under Florida law.  ECF No. 80, at 16-17.  As noted above, reliance on these materials would be improper at the motion to dismiss stage.  Nonetheless, based on the information just in the Complaint, the Agreement and the other materials I may presently consider, the amount of interest may well be beyond the 25 percent allowed under Florida law.  Section 5.5 authorizes Plaintiff to charge a one-half percent collateral management fee on the first day of each month – amounting to an annual rate of 6 percent.  Section 5.1 authorizes Plaintiff to charge at least 9.75 percent factoring fee.  Additionally, Section 1.15 authorizes Plaintiff to charge Brigade one percent for each ten-day period beyond the initial ninety days that a payment is due, but remains unpaid – amounting to an annual rate of more than 36 percent by itself.

Plaintiff, recognizing the combined effect of these fees, raises two arguments in response.  First, Plaintiff notes that the Agreement includes a savings clause providing that in no event shall the Agreement allow Plaintiff to charge more interest than allowable under applicable state law if the Agreement is found to be a loan and not a factoring agreement.  While a savings clause is

relevant – particularly so at the motion to dismiss stage, it does not negate contrary evidence in the Agreement. *Jersey Palm-Gross, Inc. v. Paper*, 658 So. 2d 531, 535 (Fla. 1995) ("we conclude that a usury savings clause cannot, by itself, absolutely insulate a lender from a finding of usury. Rather, we approve and adopt the Fourth District's holding, that a usury savings clause is one factor to be considered in the overall determination of whether the lender intended to exact a usurious interest rate.").

Second, Plaintiff argues that, under Florida law, late fees may not be considered when determining the applicable interest rate.  ECF No. 89, at 23 citing *Connecticut Mut. Life Ins. Co. v. Fisher*, 165 So. 2d 182, 184 (Fla. Dist. Ct. App. 1964) ("Clearly, as to principal, the provision for payment of interest at 10% per annum after maturity did not infect the transaction with usury, as it only designated a different rate of interest to be paid after maturity than the rate payable for the time prior to maturity"); *see also Hurley v. Slingerland*, 461 So.2d 282, 284 (Fla. Dist. Ct. App. 1985) ("Next, appellant argues that the transaction was usurious.  We disagree.  The interest provided for upon default did not constitute a usurious amount."); *Benson v. First Trust & Savings Bank*, 134 So. 493, 496 (1931) ("if the loan runs for its full term as agreed on, [and the interest] will not equal or exceed 25 per centum per annum, the legal consequences of such an arrangement must be tested by the results contemplated by the parties on the assumption that both lender and borrower will fully carry out their agreement rather than the special results which may follow, but are not necessarily certain to ensue, when the borrower breaches a covenant"); *In re 8699 Biscayne, LLC*, 465 B.R. 901 (Bankr. S.D. Fla. 2011) ("based upon the relevant Florida case law and related persuasive treatises and supplemental authorities, the "pre-payment penalty clause" under the Loan herein cannot be permitted to influence the usury calculations undertaken by this Court as to the Loan's effective interest rate at inception."); *In re Sundale, Ltd.*, 410 B.R. 101 (Bankr. S.D. Fla.

2009) ("Florida law expressly recognizes a lender's right to charge default interest if the underlying loan documents so provide.").

Defendants attempt to distinguish the cases cited above on multiple bases. First, Defendants distinguish *Connecticut Mutual Life* on the basis that a late charge under the Agreement could result due to something other than a party's failure to comply with the Agreement – namely, a third-party debtor's failure to pay. ECF No. 91, at 15. Accordingly, Defendants could comply with the Agreement's terms and still be subject to the late fees, thus distinguishing this case from others in which any additional charges would accrue only if one of the parties failed to comply with the agreement's terms. *Id.* Defendants' argument may have some merit. However, the question of what led to the breach in this case is a question of fact that cannot be determined at the motion to dismiss stage. Here, Plaintiff has alleged that the breach arose out of Defendants' direction to BGE to remit payment to the Internal Revenue Service. Accordingly, at this stage of the case, the distinction does not support dismissal of the Complaint.[6]

Likewise, Defendants attempt to distinguish *In re 8699 Biscayne* on the grounds that involved a pre-payment penalty as opposed to a late fee. While this may be a relevant distinction, it is unclear from Defendants' briefing why it dictates a different result.[7]  Nonetheless, because I

---

[6] *Connecticut Mutual Life* is additionally distinguishable on the grounds that it involved a rate of interest to be applied in case of a default that, although higher, was still low enough to not be usurious. 165 So.2d at 184 ("First, as to principal, the note could have provided for interest at a given rate to be paid on the principal 'until paid,' in which event the specified rate would have applied not only to maturity but after maturity. Instead, a medium rate of interest (5.5% per annum) was imposed on the principal prior to maturity and a higher though lawful rate (10% per annum) was imposed on matured principal.").

[7] Defendants note that "[t]he court could not condone Borrower's exercising its prepayment option with the intention of obtaining the benefits of forcing upon his lender a usury statute violation." ECF No. 91, at 14. It is not clear the extent to which the court in *In Re 8699 Biscayne* was guided by this consideration. The Court was influenced by the fact that any increase in the interest rate

have already determined that it is unclear whether the Agreement constituted a loan, I refrain from determining, at this preliminary stage, whether the "Late Charge" may be considered interest.[8]

### C. I Cannot Determine at the Motion to Dismiss Stage Whether the Plaintiff Possessed the Requisite Corrupt Intent Under Florida Law.

Finally, the parties dispute whether a corrupt intent to commit usury is apparent from the face of the Complaint and the documents I may presently consider.  ECF No. 89, at 25; ECF No. 91, at 18.  Although the usurious character of a contract is established at its inception, Florida courts have held that corrupt intent is generally a question of fact inappropriate for determination at the motion to dismiss stage.  *Dixon v. Sharp*, 276 So.2d 817, 822 (Fla. 1973) ("We find that the District Court of Appeals, Fourth District, in its decision . . . erred in affirming the Final Judgment of the trial finding that requisite intent can be determined solely from mathematical consequences of the agreement entered into between the parties.  Corrupt intent should be determined from all the circumstances surrounding the transaction rather than being determined by an inflexible rule which measures the mathematical result."); *Rollins v. Odom*, 519 So.2d 652, 658 (Fla. 1988) ("it is the fact that the lender consciously intends and does in fact make charges which result in usury that establishes the requisite element of corrupt intent.").

---

occurred as a result of voluntarily actions to pre-pay; thus, any consequences resulted from the borrower's own actions.  *See In Re 8699 Biscayne*, 465 B.R. at 911 ("A borrower's voluntary payment of a loan before maturity, made pursuant to a prepayment option in the contract, will not render the transaction usurious if the total interest received by the lender does not exceed the interest computed at the maximum lawful rate from the time the loan became available to the borrower to the absolute maturity date specified in the contract, especially where the pre-payment provision is entirely optional with the borrower.").

[8] Relatedly, Defendants argue that even if the late fee was not properly considered interest, Defendants also charged a separate "over advance fee" of 12 percent for any late payments.  ECF No. 91, at 14.  Defendants overlook that the over advance fees are subject to the same argument Plaintiff uses to contest the late fee.

Defendants raise several arguments in support of a finding, as a matter of law, that corrupt intent existed.  First, Defendants argue that corrupt intent may be presumed where the interest to be charged under the Agreement is greater than 25 percent.  ECF No. 91, at 18.  As noted above, because it is unclear whether the total amount of interest is more than 25 percent, such a presumption is currently inapplicable to this case.  Second, Defendants argue that pursuant to the Agreement, all amounts owed to Plaintiff, collected by Brigade, may be applied to any Obligations Brigade has to Plaintiff, at Plaintiff's discretion.  *Id*. at 20.  While this provision may be more determinative to Defendants' argument as the case progresses, without any evidence that the provision was intended or used to increase the amount of interest Plaintiff owed, it has limited impact on the establishment of corrupt intent at the motion to dismiss stage.  Third, Defendants highlight that the Agreement reflects an intent to deceive the Court as to the nature of the Agreement, by charging percentages of amounts owed for particular fees in lieu of set amounts.  ECF No. 80, at 21.  As noted above, the relevant question under Florida law is not whether an agreement charges interest, but whether there is an intent to charge more than the amount under Florida law.  While these fees are important to an examination of whether the Agreement was a loan, as opposed to a factoring agreement, absent evidence that the total of the fees amounted to more than the amount allowed under Florida law, they are insufficient to establish a corrupt intent.  Finally, Defendants cite the Indemnification Agreement as evidence that Plaintiff was aware that the Factoring Agreement was invalid, and thus, induced Defendants to agree to an indemnification agreement to protect itself.  ECF No. 80, at 21-22.  Defendants' argument has some merit, as the Agreement explicitly provides that Mr. Bethell waives any claims arising out of the "invalidity or unenforceability of the Obligations."  Defendants, however, ignore that the Agreement also

explicitly protects Plaintiff in a variety of other circumstances unrelated to the legality of the Agreement.

Finally, Defendants argue that Plaintiff is a sophisticated lender who was likely well aware of Florida law prohibiting usurious loan agreements.  ECF No. 80, at 20; *see also Valliapan v. Cruz*, 917 So.2d 257 (Fla. 2005) (finding that neighbor who lent money to husband and wife did not have corrupt intent because neighbor was an unsophisticated lender trying to help out his friends, loan terms were hand-written by wife, and neighbor acted entirely in good faith.).  While the scope of Plaintiff's experience is relevant, it is insufficient to justify the dismissal of Plaintiff's Complaint, on a motion to dismiss, where all other information is in equipoise.  As noted above, upon a motion to dismiss, I must draw all inferences in favor of the Plaintiff.  As such, Plaintiff's background as an experienced lender considered in the context of the other evidence, which is conflicting, does not, at this time, justify a conclusive finding that Plaintiff acted with the requisite corrupt intent.

### IV.     Defendants' Remaining Arguments, Likewise, Do Not Justify the Dismissal of Plaintiff's Complaint at the Current Time.

Defendants' remaining arguments are dependent on a conclusion that the Factoring Agreement is usurious.  First, Defendants argue that because the Indemnification Agreement sought to transfer responsibility for complying with the usurious agreement to Mr. Bethell, the Indemnification Agreement is also invalid and Mr. Bethell is not liable to the Plaintiff.  ECF No. 80, at 27.  Second, Defendants argue that each of Plaintiff's tort claims cannot survive if the Agreement was illegal.  *Id.* at 29.  Because both of these arguments are dependent upon a

conclusion that I have rejected for the time being – that the Agreement was invalid – these defenses likewise do not justify the dismissal of the Complaint at this time.[9]

## CONCLUSION

To be clear, at this stage of the case, I do not make a final determination as to the nature of the Agreement; nor do I make a conclusive finding regarding the precise amount of interest due under the Agreement or whether Plaintiff acted with the corrupt intent necessary to establish the affirmative defense.  As Defendants correctly note, Florida has a strong public policy against usurious loan agreements.  Likewise, their arguments, if correct, raise serious concerns. Nonetheless, the determinations which Defendants ask the Court to make are better suited for a motion for summary judgment after discovery has concluded.  For the present moment, my role is to determine if Plaintiff, through the Complaint and appropriately incorporated documents, alleges claims which are facially plausible.  Given the relevant standard and the evidence I may presently consider, Plaintiff has satisfied its burden.

For the reasons stated above, Defendants' Motion to Dismiss is DENIED and Plaintiff's Motion to Strike is GRANTED.

So ordered.

Dated: August 29, 2022

_____/s/_____
Ajmel A. Qureshi
U.S. Magistrate Judge

---

[9] Plaintiff contests whether their tort claims are in fact dependent on the Factoring Agreement. ECF No. 89, at 31.  Because I have denied Defendants' arguments on other grounds, I do not reach this argument.