**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**
**(SOUTHERN DIVISION)**

| | | |
|---|---|---|
| AEGIS BUSINESS CREDIT, LLC, | * | |
| Plaintiff, | * | |
| v. | * | Civil Case No. 8:21-cv-00668-AAQ |
| BRIGADE HOLDINGS, INC., *et al.*, | * | |
| Defendants. | * | |

## **MEMORANDUM OPINION**

This is a case pertaining to an individual's and a corporation's alleged failure to abide by provisions of a contract requiring them to pay certain amounts of money to another corporation. Pending before the Court is Defendant William Bethell's ("Defendant Bethell") Motion for Summary Judgment, ECF No. 183, and Plaintiff Aegis Business Credit, LLC's ("Plaintiff" or "Purchaser") Motion for Summary Judgment, ECF No. 184. Both Motions are fully briefed. ECF Nos. 183, 184, 187, 188, 189, 190. For the following reasons, Plaintiff's Motion for Summary Judgment is granted, and Defendant's Motion for Summary Judgment is denied.

## **BACKGROUND**

Plaintiff is a Florida-based limited liability corporation that, among other things, provides financial assistance to corporations facing financial difficulties. ECF No. 184-2, at 2. Plaintiff is "[i]n the business of providing factoring, asset based lending and other solutions to clients to finance their growth, working capital, acquisitions and buyouts, as well as other capital needs for both established and emerging companies." *Id.* Defendant Brigade Holdings, Inc. is a Delaware-based corporation, ECF No. 184-2, at 2-3, that, "was in the business of installing energy efficient

lights in commercial buildings under their local utility company's commercial rebate programs." ECF No. 183-4, at 2. Defendant Bethell is the owner of Brigade. *Id.*

On November 20, 2018, Plaintiff and Defendants entered into what was termed a "Factoring and Security Agreement" (the "Agreement"). ECF Nos. 183-3, 184-10. Under the terms of the Agreement, Plaintiff agreed to purchase receivables generated by Defendant Brigade's participation in rebate programs regarding the design, manufacture, and installation of LED lights. ECF No. 183-2, at 2-3; ECF No. 184-2, at 3, 5-7. Defendants sought to obtain financing for Brigade by selling such receivables to Plaintiff. ECF No. 184-2, at 5-7. Defendants had been unable to obtain financing from other sources. *Id*. at 3. Pursuant to Section 2.4 of the Agreement, the "sales" of the amounts due would occur as follows:

> [Brigade] shall submit Invoices and Accounts to offer for sale to [Aegis] in accordance with the Agreement. [Aegis] shall then review Invoices and related information to decide whether any of such Invoices and Accounts shall be purchased. [Aegis] may accept or reject any Invoice at its sole and absolute discretion, and [Aegis] shall bear the credit risk of nonpayment as a result of an insolvent account debtor for those Invoices and the resulting Accounts. Nothing in this Agreement obligates [Aegis] to purchase any particular invoice.

ECF No. 183-3, at 4; ECF No. 184-10, at 4. When Brigade transferred a receivable, or invoice, to Plaintiff, Plaintiff advanced 85% of the invoices' face value. ECF No. 183-3, at 4; ECF No. 183-4, at 2-3; ECF No. 184-2, at 45; ECF No. 184-10, at 4. Then, upon collection of the funds from the utility company, Plaintiff would calculate the amount Brigade owed, based on the number of days the invoice was outstanding. ECF No. 183-4, at 3. Plaintiff deducted this amount from the 15% previously held back and released the remainder to Brigade. *Id.* The Agreement's stated loan amount is $1,500,000. ECF No. 183-3, at 4; ECF No. 184-2, at 35.

The Agreement specifies methods of recourse available to Plaintiff. Section 2.1 of the Agreement states that once "[Brigade] sell[s] to [Aegis,]" Plaintiff Aegis shall be "absolute owner, without recourse on those of Seller's Accounts that have been purchased by Purchaser." ECF No. 183-3, at 3; ECF No. 184-10, at 3. Section 6 of the Agreement notes, however, that the Purchaser – in this case, Plaintiff – shall have full recourse against the Seller – in this case, Defendant – for all situations in which non-payment occurs other than those resulting from Account Debtors who become insolvent after the issuance of an invoice that Plaintiff purchased. ECF No. 183-3, at 6; ECF No. 184-10, at 6. Further, Section 8 of the Agreement states that "[u]nless an Account Debtor is Insolvent, Purchaser may require that the Seller repurchase" by paying the amount due to the Purchaser that has not been paid or is otherwise not available to the Purchaser. ECF No. 183-3, at 6-7; ECF No. 184-10, at 6-7. The Agreement specifies the method of payment in Section 1.25, identifying a "Reserve Account," maintained on the "books of Purchaser representing the unpaid portion of Seller's Bonus, maintained by Purchaser to ensure Seller's performance with the provision." ECF No. 183-3, at 3; ECF No. 184-10, at 3.

Section 5 of the Agreement provides that in addition to the charges in cases of an Account Debtor's non-payment, Defendant Brigade shall be responsible for additional fees and expenses under the Agreement. ECF No. 183-3, at 5-6; ECF No. 184-10, at 5-6. Among other fees, the Agreement provides for a daily factoring fee that is payable on the tenth of each month; an annual facility fee of $15,000 due on the annual anniversary of the Agreement; and a collateral management fee calculated at 0.5% of the average funds outstanding, payable on the first day of each month. *Id.*

Additional charges accrue under the Agreement in the case of a default:

> [I]n addition to any rights Purchaser has under this Agreement or applicable law, Purchaser may immediately terminate this

> Agreement, at which time all Obligations shall immediately become due and payable without notice. . . . The Late charge shall accrue and is payable on demand of any obligations not paid when due.

ECF No. 183-3, at 10; ECF No. 184-10, at 10. Section 1.15 of the Agreement provides that the Late Charge shall be "1% for each 10-day period." ECF No. 183-3, at 2; ECF No. 184-10, at 2.

The Agreement includes multiple additional terms relevant to the current dispute between the parties. First, pursuant to Section 28 of the Agreement, the Agreement and all transactions thereunder are governed by, constructed under, and enforced in accordance with the laws of the State of Florida. ECF No. 183-3, at 11; ECF No. 184-10, at 11. Second, the Agreement contains multiple provisions relevant to the parties' understanding of the Agreement's nature. Section 5.12 of the Agreement states that the transactions:

> described [in the Agreement are] a "true sale" of accounts and not a loan. Notwithstanding the foregoing, in the event that it is determined by a court of competent jurisdiction or other decider of law and fact that the transactions described herein are loans, then regardless of any provision contained in this Agreement or any other agreement or any other agreement or document executed in connection herewith, in no contingency or event whatsoever shall the aggregate of all amounts that are contracted for, charged or received by Purchaser pursuant to the terms of this Agreement or any other documents . . . deemed interest under applicable law exceed the highest permissible [rate] under applicable law.

ECF No. 183-3, at 6; ECF No. 184-10, at 6. The same provision goes on to note that nothing in the Agreement shall be construed as allowing Plaintiff to charge interest in excess of the amounts allowed under applicable state law, and that if such interest is charged, Defendant Brigade stipulates that it shall be the result of a bona fide error. *Id.* Any amount found to be excess of applicable state law shall then "be applied first to reduce the Obligations and the balance, if any, returned to [Brigade], it being the intent of the parties hereto to not to enter into a usurious or

otherwise illegal relationship." *Id.* Third, Section 2.7 of the Agreement provides that the "[p]urchaser may withhold or offset any [amounts Brigade owes Plaintiff] from the Purchase Price of any Invoice, and may establish such reserves as it determines in its sole discretion from time to time." ECF No. 183-3, at 4; ECF No. 184-10, at 4. Section 4.1 of the Agreement states that "Seller shall pay to Purchaser on demand the amount of any Reserve Shortfall." ECF No. 183-3, at 5; ECF No. 184-10, at 5. Finally, Section 9 of the Agreement provides that Purchaser maintains "a continuing first priority security interest in and to the Collateral." ECF No. 183-3, at 7; ECF No. 184-10, at 7.

In addition to the Agreement, on the same day, Defendant Bethell signed an Indemnification Agreement, making certain pledges regarding the "Factoring and Security Agreement" and its performance. ECF No. 183-5; ECF No. 184-11. Pursuant to the terms of the Indemnification Agreement, Defendant Bethell warranted, among other things, that: 1) "[e]ach Account of Debtor . . . is genuine, valid, subsisting and enforceable in accordance with its terms[;]" 2) "[e]ach Account is accepted by the corresponding Account Debtor, and there are no defenses, setoffs, credits, contra or counter-claims against, or disputes with respect to . . . any Account . . . [;]" and 3) "[a]ll services to be performed by Debtor in connection with each Account have been performed by Debtor." *Id.* Additionally, Defendant Bethell indemnified Plaintiff "from any loss, including any actual, consequential, incidental or other damage . . . incurred by [Plaintiff] as a result of, or arising out of, the breach of any covenants, warranties or representations . . . made by Debtor or Indemnitor to [Plaintiff]." ECF No. 183-5, at 3; ECF No. 184-11, at 3. Finally, by signing the Indemnification Agreement, Defendant Bethell agreed to waive any and all claims arising out of: 1) "[a]ny release, settlement or compromise of any obligations of Debtor[;]" 2)

"[t]he invalidity or unenforceability of the Obligations[;]" and 3) "[t]he filing of an insolvency proceeding by or against Debtor." *Id.*

On January 31, 2019, the parties agreed to an Amendment to the Factoring Agreement allowing Defendants to obtain additional funding to purchase inventory. ECF No. 184-20. The Amendment allowed Plaintiff to make advances up to $300,000 or 50% of the purchase price of the inventory obtained with Brigade's financing. *Id.* at 2-3. If Plaintiff advanced funds to Brigade for specified inventory, all such inventory had to be "located in locations where the owner of such location shall have entered into a landlord's or warehousemen's waiver in favor of [Plaintiff] . . . [Further, Brigade] shall not sell, encumber or dispose of or permit the sale, encumbrance or disposal of any Inventory without [Plaintiff]'s prior written consent." *Id.* at 3.

From 2019 to 2020, pursuant to the Agreement and the Amendment to the Agreement, Plaintiff purchased receivables from Defendant Brigade and financed Defendant Brigade's purchases of inventory. ECF No. 184-2, at 11; ECF No. 183-3; ECF No. 184-10; ECF No. 184-20. During this time frame, Defendant Brigade engaged in a significant project to install LED lighting at Dwight D. Eisenhower Junior High School for utility provider Baltimore Gas & Electric Company ("BGE"). ECF No. 184-2, at 13. For this project, Defendant Brigade expected to be paid around $180,000 under an available rebate program. *Id.* As a result of that expected payment, and on the basis of information Defendant Brigade provided stating an inventory valuation of $779,931, Plaintiff continued to fund Defendant Brigade's purchase of inventory under the Amendment to the Agreement. *Id.* at 11-14.

In April 2020, the relationship between the parties deteriorated: Plaintiff alleges Defendants breached the Agreement, as well as the Amendment to the Agreement, by refusing to provide required financial reporting and refusing to allow an inventory inspection. *Id.* at 15.

According to Plaintiff, it reserved its rights and chose not to pursue available remedies under the Agreement as it attempted to resolve its disputes with Defendants. *Id.* However, on August 13, 2020, Defendant Bethell relayed to Plaintiff that: Defendant Brigade had ceased doing business; Defendant Brigade no longer needed Aegis financing; and he did not know the location of collateral securing the Agreement. *Id.* at 17. Defendant Brigade, at Defendant Bethell's direction, used the inventory Plaintiff financed on jobs not disclosed to Plaintiff and then reduced it to cash, which Defendant Brigade collected. *Id.* at 19-20. Defendant Bethell then directed rebates due to Plaintiff to instead be remitted to the Internal Revenue Service for the resolution of unpaid federal income taxes. *Id.* at 20.

On August 19, 2020, Plaintiff's representatives inspected Defendant Brigade's warehouse in Maryland and confirmed that the inventory was no longer held at that location. *Id.* at 19. Plaintiff's representatives subsequently located the remaining inventory at a different warehouse in Maryland. *Id.* The owner of the new warehouse stated that Defendant Bethell had entered into a storage agreement with the new warehouse "two or three weeks prior." *Id.* Defendant Brigade was holding the inventory on behalf of a consignor, and the consignor had not filed a financing statement. ECF No. 184-4, at 202. Plaintiff's representative promptly took the inventory that Defendant Brigade had on consignment back to Florida. ECF No. 184-4, at 199-200 ("[Plaintiff's representative] went to Veterans Storage where the inventory was, and Zac Mann and . . . people who were on site helped them load the truck . . . and take the product back to Florida.").

Plaintiff filed its initial Complaint against Defendants Bethell and Brigade on March 17, 2021, ECF No. 1, and a Second Amended Complaint on November 19, 2021. ECF No. 76-1. Therein, Plaintiff asserts a series of claims against Defendant Brigade and Defendant Bethell including: (i) breach of contract; (ii) fraud and intentional misrepresentation; (iii) concealment and

deceit; and (iv) fraudulent inducement. *Id*. at 13-28. Plaintiff also brings claims for tortious interference with contract against Defendant Bethell and a claim for conversion against Defendant Brigade. *Id.* at 25-27.

On December 3, 2021, Defendants filed their Motion to Dismiss, which the parties subsequently fully briefed. ECF Nos. 80, 89, 91. The case was reassigned to the undersigned on April 29, 2022. After a Motions Hearing held on June 7, 2022, the Court entered a Memorandum Opinion denying Defendants' Motion to Dismiss. ECF Nos. 97, 98.

On October 19, 2022, Defendant Brigade filed counterclaims against Plaintiff including: (i) conversion; (ii) breach of contract; and (iii) tortious interference with an advantageous business relationship. ECF No. 101, at 19-21.

On July 9, 2025, Plaintiff deposed Defendant Bethell. ECF No. 184-4. During the deposition, Defendant Bethell testified that, in addition to the fees set out in the Factoring Agreement, Aegis began charging "over-advance fee[s]" four months into the parties' contractual relationship. *Id.* at 297. Defendant Bethell stated that the over-advance fees were 12% on an annual basis. *Id.* at 298. However, Defendants' briefing has abandoned this calculation. According to Defendants, "Aegis charged interest rates of 11.139%, plus additional 'collateral management fees' and 'over advance fees' which brought the effective interest rate of the Agreement to 20.644%." ECF No. 188, at 3.

Plaintiff's representatives confirm this course of dealing, but explained that the over advance fees were for additional funding Brigade needed to operate its business separate and apart from the sale of receivables under the Agreement. *See* ECF No. 184-3, at ¶ 13 ("Over Advances were agreed by the parties to be charged monthly based on the average amount of over-advances in a given month multiplied by 1%. Over Advances and Over Advance Fees began in March of

2019 and increased as Brigade required additional capital due to its failing business."); ECF No. 184-21, at 5 (same). The Court requested and the parties provided supplemental briefing confirming this point. ECF Nos. 191, 193, 194. Although the parties disagree about whether the Over Advance Fees are properly considered as part of the case, they agree that the Over Advance Fees were charged on top of the rates set out in the Factoring Agreement. ECF No. 193, at 2; ECF No. 194, at 1-2. Plaintiff asserts, with a declaration in support, that the over advance fee was one percent of the average amount of over advances in a month. ECF No. 183-4, at 13. According to Plaintiff, the total amount of Over Advance Fees charged over the course of two years was $49,277.90. *Id.* at 32. Applying Florida's "spreading statute", Fla. Stat. Ann. § 687.03(3), pursuant to which the amount of interest is spread over the average funded amount, Plaintiff asserts that the additional interest rate associated with the Over Advance Fees was 3.505%. As noted, Defendants, in their briefing, adopted this calculation. *See* ECF No. 188, at 3 (citing with approval Plaintiff's calculation in ECF No. 184-3, at 7).

On October 1, 2025, Defendants filed a Motion for Leave to File an Amended Counterclaim in order to add Defendant Bethell as a party to Defendant Brigade's Counterclaim. ECF No. 170. On December 23, 2025, the Court denied Defendants' Motion to Amend the Counterclaim to include Defendant Bethell as a party, in part to due to Defendants' failure to meet the deadline to amend the pleadings. ECF No. 181.

On January 16, 2026, Defendant Bethell filed his Motion for Summary Judgment. ECF No. 183. Therein, Defendant Bethell argues that: (i) the Agreement is a loan transaction subject to usury restrictions; (ii) interest charged under the Agreement violated Florida's usury law; (iii) Plaintiff possessed the requisite intent to violate Florida's usury law; and (iv) Plaintiff must forfeit the collected principal and interest totaling $4,100,708.20. ECF No. 183-2, at 5-12. That same

day, Plaintiff filed its Motion for Summary Judgment. ECF No. 184. Therein, Plaintiff asserts that Plaintiff's claim for breach of contract must prevail as a matter of law and Defendants' affirmative defense of usury must fail. ECF No. 184-1, at 9, 48. Plaintiff also argues that Defendant Brigade's counterclaims for conversion, breach of contract, and tortious interference with advantageous business relationships must fail. ECF No. 184-1, at 43-48. Both Motions have since been fully briefed. ECF No. 187, 188, 189, 190.

## STANDARD OF REVIEW

The Court will grant a motion for summary judgment only if there exists no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). If there are factual issues "that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party," then the Court must deny the request for summary judgment. *Anderson*, 477 U.S. at 250; *see Pulliam Inv. Co. v. Cameo Props.*, 810 F.2d 1282, 1286 (4th Cir. 1987); *Morrison v. Nissan Motor Co.*, 601 F.2d 139, 141 (4th Cir. 1979); *Stevens v. Howard D. Johnson Co.*, 181 F.2d 390, 394 (4th Cir. 1950). The moving party bears the burden of showing that there is no genuine issue of material fact. Fed. R. Civ. P. 56(a); *Pulliam Inv. Co.*, 810 F.2d at 1286 (citing *Charbonnages de France v. Smith*, 597 F.2d 406, 414 (4th Cir. 1979)). When ruling on a motion for summary judgment, the court must draw all reasonable inferences in favor of and construe the facts in the light most favorable to the nonmoving party. *See Tinsley v. First Union Nat'l Bank*, 155 F.3d 435, 438 (4th Cir. 1998). "A party who bears the burden of proof on a particular claim must factually support each element of his or her claim." *Scott v. United States*, No. PJM-06-2777, 2007 WL 3020185, at *1 (D. Md. Feb. 23, 2007). Thus, on those issues on which the nonmoving party will have the burden of proof, it

is his or her responsibility to confront the motion for summary judgment with an affidavit or other similar evidence. *See Anderson*, 477 U.S. at 256–57. "[I]n the face of conflicting evidence, such as competing affidavits, summary judgment ordinarily is not appropriate because it is the function of the fact-finder to resolve factual disputes, including matters of witness credibility." *U.S. EEOC v. Ecology Servs., Inc.*, 447 F. Supp. 3d 420, 437 (D. Md. Mar. 19, 2020) (citing *Black & Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002)).

**ANALYSIS**

Plaintiff's Motion for Summary Judgment shall be granted as to: 1) it's claim for breach of contract against each Defendant; 2) Defendants' affirmative defense of usury; and 3) Defendant Brigade's counterclaims.

Plaintiff advances five arguments in its Motion. First, Plaintiff asserts that the parties entered into a factoring agreement, not a loan agreement. ECF No. 184-1, at 9. Second, Plaintiff contends that even if the Agreement is considered a loan subject to Florida's usury laws, the loan's interest rate does not violate Florida law. *Id.* Third, Plaintiff argues that Defendant Brigade cannot prove that Plaintiff possessed the corrupt intent required to find a loan unenforceable under Florida usury law. *Id.* Fourth, Plaintiff argues that Defendants are jointly and severally liable for damages to Plaintiff in the amount of $1,690.269.10. *Id.* Finally, Plaintiff asserts that all of Defendant Brigade's counterclaims fail as a matter of law. ECF No. 184-1, 43-48.

Defendant Bethell, in its Motion for Summary Judgment, argues that the Agreement, which allegedly is the basis for all of Plaintiff's claims, was a usurious loan agreement, in violation of Florida law. ECF No. 183-2, at 1-2. Specifically, Defendant Bethell asserts Plaintiff violated Florida's usury laws by charging, with the requisite corrupt intent, a 42.77% per annum interest

rate under the Agreement's terms. *Id.* Defendant Bethell argues further that because the Agreement violates Florida's usury laws, the contract is unenforceable, Plaintiff's claims must fail, and Plaintiff must forfeit the principal and interest collected totaling $4,100,708.20. *Id.* at 12.

Florida statutes provide that a contract is usurious if the effective interest rate exceeds 18% per annum for loans under $500,000 and is criminally usurious for any loan with an effective interest rate that exceeds 25% per annum. Fla. Stat. §§§ 687.02(1), 687.03(1), 687.071. Under Florida law, a criminally usurious loan is not enforceable. *See* Fa. Stat. § 687.071(7) ("No extension of credit made in violation of any of the provisions of this section shall be an enforceable debt in the courts of this state."); *Velletri v. Dixon*, 44 So.3d 187, 192 (Fla. Dist. Ct. App. 2010) ("When a debt is criminally usurious, the remedy is cancellation of the debt itself and a return of any amounts paid.").

An allegation that a contract is usurious does not automatically invalidate a contract, rather it is an affirmative defense that a defendant may plead in response to a claim against it. *See Gunn Plumbing, Inc. v. Dania Bank*, 252 So.2d 1, 4 (Fla. 1971) ("The usury statute in this State does not have the effect of invalidating contracts for interest at a rate higher than the statutory maximum, but only accords to the obligor the privilege of setting up, or waiving, affirmative defenses of usury in respect to such contracts."). The party making the claim of usury bears the burden to prove all elements by clear and convincing evidence. *Nolden v. Summit Fin. Corp.*, 244 So.3d 322, 325 (Fla. Dist. Ct. App. 2018); *In re Transcapital Fin. Corp.*, 433 B.R. 900, 907 (Bankr. S.D. Fla. 2010). As this Court previously determined, Florida law governs Plaintiff's breach of contract claim. ECF No. 122, at 8 ("[g]iven the choice of law provision in this case, the Court will apply Florida law to the breach of contract claim").

## I. Although the Contract Was a Loan, the Rate of Interest Was Not Usurious.

Defendant has established that the contract was a loan, as opposed to a factoring agreement. However, because under Florida law, amounts that only become due upon breach are not included in the calculation of the interest rate, the loan is not usurious.

Florida's criminal and civil usury law is codified at Fla. Stat. § 687 *et seq*. ("No extension of credit made in violation of any of the provisions of this section shall be an enforceable debt in the Courts of this state."). Pursuant to the statute, usury requires proof of four elements: "(1) an express or implied loan; (2) an understanding between the parties that the money lent is to be returned; (3) an agreement to pay a greater rate of interest than the law allows; and (4) a corrupt intent to take more than the allowable legal rate of interest for the use of the loaned money." *In re Vision Dev. Grp. of Broward Cnty., LLC*, 411 B.R. 768, 772 (Bankr. S.D. Fla. 2009) (applying Florida law). "It is well-settled that the determination of whether a transaction is either civilly or criminally usurious is made at the inception of the loan." *World O World Corp. v. Patino*, 306 So.3d 1044, 1046 (Fla. Dist. Ct. App. 2020). For the purposes of both parties' Motions for Summary Judgment, the first, third, and fourth elements are in dispute.

**A. The Agreement is a Loan Subject to Usury Restrictions.**

Plaintiff argues that the Agreement is a sale transaction, not a loan, for three specific reasons. First, Plaintiff argues that a financing transaction is not indicative of a loan where the repayment date and repayment amount are not absolute, as is allegedly common for transactions involving accounts receivable. ECF No. 184-1, at 32. Second, Plaintiff argues that courts should adopt a totality of the circumstances approach when determining whether a financial agreement is a loan or a sale. *Id.*, at 33. If the Court employed this approach, Plaintiff asserts that the parties' practices and negotiations, together with the plain language of the Agreement, would demonstrate that they entered into a sale, not a loan. *Id.*, at 33-35. Third, Plaintiff argues that the Reserve

Account defined in Section 1.25 of the Agreement is merely a bookkeeping account; accordingly, its existence does not suggest that the transaction is a loan. ECF No. 187, at 5-6.

Courts across the country are divided over whether the sale of accounts receivable at a discounted price is a sale transaction or a loan subject to laws prohibiting usury. *See Major's Furniture Mart, Inc. v. Castle Credit Corp., Inc.*, 602 F.2d 538, 546 (3rd Cir. 1979) (holding the sale of accounts receivable was a loan, not a sale); *Carter v. Four Seasons Funding Corp.*, 97 S.W.3d 387, 400 (Ark. 2003) (holding the financial transaction was a sale of accounts receivable, not a loan); *Korrody v. Miller*, 126 S.W.3d 224, 226 (Tex. App. 2003) (holding the agreement was an agreement to factor accounts receivable, not a loan). Under a factoring agreement, "[a] factor buys accounts receivable at a discount, the factor's seller obtains immediate operating cash, and the factor profits when the face value of the account is collected." *Carter*, 97 S.W.3d at 395-96. "[C]ommercial transactions are complicated, and the determination of whether a transfer of interest in accounts receivable is truly a 'sale' or whether the payment of the 'purchase price' is in reality a 'loan,' requires a close look at the details of the transaction." *In re Burm*, 554 B.R. 5, 17 (Bankr. D. Mass. 2016). As one court noted, "[a]ccounts receivable financing is an uncertain area in the usury law and no exact tests have been formulated." *Baruch Inv. Co. v. Huntoon*, 257 Cal. App. 2d 485, 492 (Cal. Ct. App. 1967). Accordingly, some courts have held that a sale of accounts was, in fact, a loan. *See In re Qualia Clinical Serv., Inc.*, 441 B.R. 325, 330 (B.A.P. 8th Cir.) aff'd, 652 F.3d 933 (8th Cir. 2011) ("This agreement, which shifts all risk to [debtor], is a disguised loan rather than a true sale."); *Gen. Cap. Corp. v. Tel Serv. Co.*, 212 So.2d 369, 375 (Fla. Dist. Ct. App. 1968) (holding transaction was a loan and not a sale where contract required all assigned commercial paper be endorsed with full recourse to purchaser, requiring seller to "'repurchase any note or trade acceptance after default by the maker thereof', and provided for the 'deduction of a

reserve', to which [purchaser] would have recourse in the event [seller] 'failed to perform a condition of the contract'.").

While all of these decisions are helpful, the ultimate question is the nature of the agreement under Florida law. When determining the true nature of an agreement, Florida courts look to the substance of a transaction and not solely the form or designation given to it by the parties. *L'Arbalete, Inc. v. Zaczac*, 474 F.Supp.2d 1314, 1325 (S.D. Fla. 2007). Although the Agreement states that the invoice purchases are a true sale of the invoices, ECF No. 183-2, at 7, "a finding of usury depends on the intent and understanding of the parties." *Oregrund Ltd. P'ship v. Sheive*, 873 So.2d 451, 457 (Fla. Dist. Ct. App. 2004). "A transaction that is either entirely or partially in the form of a sale, may be usurious when the intent is to make a loan of money for a greater profit than allowed by statute." *Id*. However, in the same way that a label is not determinative, the question of the parties' intent does not turn on what they say after the fact as to what they intended. If this was the case, the parties could easily conceal illegal conduct. Rather, "all of the negotiations, circumstances and conduct of the parties surrounding and connected with their contracts may be material in determining whether the form thereof covered an intent to violate the usury law[.]" *Indian Lakes Estates, Inc. v. Special Investments, Inc.*, 154 So.2d 883, 889 (Fla. Dist. Ct. App. 1963). Corrupt intent does not turn on whether the parties specifically intended it to be a loan but requires "proof that the lender intended to collect payments for the loan which, when expressed as a simple rate of interest per annum, exceeded the maximum allowable rate." *Saralegui v. Sacher, Zelman, Van Sant Paul, Beily, Hartman & Waldman, P.A.*, 19 So.3d 1048, 1051 (Fla. Dist. Ct. App. 2009); *see also River Hills, Inc. v. Edwards*, 190 So.2d 415, 424 (Fla. 1966) ("The requisite corrupt or purposeful intent, however, is satisfactorily proved if the evidence establishes that the *charging*

*or receiving of excessive interest was done with the knowledge of the lender*.") (emphasis in original).

Florida courts have approved the consideration of various factors in determining whether an agreement is a loan, including, but not limited to: 1) whether the agreement required an assignment of commercial paper; 2) whether the alleged lender withheld a discount and/or reserve; 3) whether the reserve would be repaid once the paper was paid in full; 4) whether the agreement required the borrower to repurchase any defaulted paper; 5) the degree of recourse that a lender had against a borrower in case of a default; and 6) whether individual stockholders of the borrower guaranty the transaction at issue. *See W.B. Dunn Co., Inc. v. Mercantile Credit Corp.*, 275 So.2d 311, 316 (Fla. Dist. Ct. App. 1973) (citing with approval the application of the aforementioned factors in determining whether the sale of contracts was a loan); *Endico Potatoes, Inc. v. CIT Group/Factoring, Inc.*, 67 F.3d 1063, 1068 (2d Cir. 1995) (identifying factors relevant to determining whether a party was a "bona fide purchaser": "the right of the creditor to recover from the debtor any deficiency if the assets assigned are not sufficient to satisfy the debt, the effect on the creditor's right to the assets assigned if the debtor were to pay the debt from independent funds, whether the debtor has a right to any funds recovered from the sale of assets above that necessary to satisfy the debt, and whether the assignment itself reduces the debt").

Although there is some variance between the tests courts have applied, an important factor is the degree of risk the purchaser of accounts bears. *See Craton Entertainment, LLC v. Merchant Capital Group, LLC*, 314 So.3d 627, 627 (Fla. Dist. Ct. App. 2021) (citing several Florida cases holding that where the purchaser of accounts bears risk the transaction may not be usurious); *Endico Potatoes*, 67 F.3d at 1069 (holding "[t]he root of all of these factors" relevant to determining whether a transaction is usurious "is the transfer of risk."). A purchaser's risk may be

minimized through recourse or repayment requirements. *See Nickey Gregory Co., LLC v. AgriCap, LLC*, 597 F.3d 591, 602 (4th Cir. 2010) (holding transaction between parties is a loan and not a sale where purchaser had "almost total recourse" against seller through a repayment clause). "Where the 'seller' retains 'virtually all of the risk of noncollection,' the transaction cannot properly be considered a true sale." *In re Qualia Clinical Serv., Inc.*, 441 B.R. at 330; *see Fireman's Fund Ins. Cos. v. Grover (In re Woodson)*, 813 F.2d 266, 271 (9th Cir. 1987) (finding transaction to have been a disguised loan where seller insured buyer against loss); *Bear v. Coben (In re Golden Plan of California, Inc.)*, 829 F.2d 705, 709-10 (9th Cir. 1986) (finding that there had been a true sale where "investors received no contractual guarantee of repayment or compensation in case of foreclosure. Such assumption of risk strongly suggests that the . . . investors were not in a creditor-debtor relationship").

Applying these principles, the Agreement in this case is a loan subject to Florida's prohibition on usury. Although there is no per se rule that the purchaser's ability to seek significant recourse against the seller automatically converts a factoring agreement into a loan,[1] the degree of recourse is an important factor. *See Gen. Cap. Corp.*, 212 So.2d at 375 (holding transaction between parties was a loan and not a sale where agreement required all assigned commercial paper to be "endorsed with full recourse" to purchaser and purchaser would have recourse in the event buyer failed to perform a condition of the contract); *Nickey Gregory Co., LLC*, 597 F.3d at 602 (holding transaction between parties is a loan and not a sale where purchaser had "almost total

[1] Plaintiff argues that Defendant Bethell mischaracterizes the law and that significant recourse is not *per se* sufficient to convert a sale transaction into a loan. ECF No. 187, at 4. This Court has previously determined that there is no *per se* rule that the presence of "substantial recourse" automatically converts a factoring agreement into a loan, but the ability to seek recourse is a relevant factor. ECF No. 98, at 23; *see Major's Furniture Mart*, 602 F.2d at 544 ("The comments to § 9-502(2) (and in particular Comment 4) make clear to us that the presence of recourse in a sale agreement without more will not automatically convert a sale into a security interest.").

recourse" against seller). Under the Agreement, Plaintiff has the ability to seek meaningful recourse against Defendant Brigade as it requires Defendant Brigade to repurchase the debt or pay the invoice if the account debtor does not pay it. ECF No. 183-3, at 6 ("Purchaser shall have full recourse against Seller for all other reasons of non-payment which shall be treated as a zero-collection resulting in Reserve Shortfall, or Purchaser may require Seller to repurchase the Account"); *see W.B. Dunn Co., Inc.*, 275 So.2d at 313 (holding that transactions were loans and not sales where seller was required to repurchase contracts in default and purchaser had "recourse to reserve fund against [seller] in event of default by retail purchaser" among other factors). Defendant Brigade, not Plaintiff, bears the entire risk of loss should the invoice not be paid or should it be paid for less than its face amount. *See* ECF No. 183-3, at 6-7, ("[u]nless an Account Debtor is insolvent, Purchaser may require that Seller repurchase" by repaying the amount due to the Purchaser that has not been paid or is otherwise not available to the Purchaser); *In re Tammey Jewels, Inc.*, 116 B.R. 290, 292 (Bankr. M.D. Fla. 1990) (holding that the transaction is a loan where "the Agreement imposes an absolute obligation on [seller] to repay the guaranteed amount"); *Oregrund Ltd. P'ship*, 873 So.2d at 457 ("sale-option transaction may be considered a loan when the loan is unconditional and compels the vendor to repurchase the property for an amount that, if the loan was disguised as a sale, the 'return' or profit would be usurious") (citing *Bermil Corp. v. Sawyer*, 353 So.2d 579 (Fla. Dist. Ct. App. 1977)); *Major's Furniture Mart, Inc.*, 602 F.2d at 546 ("It is apparent that on this record none of the risks present in a true sale is present here. Nor has the custom of the parties or their relationship . . . given rise to more than a debtor/creditor relationship in which [seller's] debt was secured by a transfer of [seller's] customer accounts to [purchaser]"); *Endico Potatoes, Inc.*, 67 F.3d at 1069 (holding where "the lender's risk is derivative or secondary, that is, the borrower remains liable for the debt and bears the risk of

non-payment by the account debtor, while the lender only bears the risk that the account debtor's non-payment will leave the borrower unable to [pay]," then there has not been a bona fide purchase of receivables and the transaction is, in substance, a loan.).

In addition to Plaintiff's right to seek substantial recourse against Defendants, multiple other factors weigh in favor of classifying the Agreement as a loan, and not a sale. First, Plaintiff withheld a portion of the principle as a reserve. *See W.B. Dunn Co., Inc.*, 275 So.2d at 313 (holding transaction was a loan, not a sale in part because purchaser deducted a portion of the principle sum as a reserve). When Defendant Brigade transferred a receivable or invoice to Plaintiff, Plaintiff advanced, as a loan, 85% of the invoice's face value. ECF No. 183-2, at 3. Then, "[u]pon collection of the funds from the utility company," Plaintiff would calculate an amount Defendant owed, based on the number of days the invoice was outstanding. ECF No. 183-2, at 3. Plaintiff deducted this amount from the 15% previously held back and released the remainder to Defendant Brigade. *Id.*; *see Nickey Gregory Co., LLC*, 597 F.3d at 63 ("[T]he transaction is more accurately characterized as a revolving line of credit, secured by accounts receivable and other assets, and repaid from monies collected by [purchaser] on the receivables . . . When [purchaser] collected on the receivable, as it was hired to do, it retained (1) 80% as repayment of the loan; (2) a collection fee of 1.5%; and (3) interest at a rate of the lesser of 12% or 6% over prime for the period during which the 80% amount was outstanding.").

Second, the Indemnification Agreement supports categorizing the Agreement as a loan. The Indemnification Agreement requires Defendant Bethell to reimburse Plaintiff for any losses it incurs pursuant to the Agreement. *See* ECF No. 183-5, at 3 ("Indemnitor indemnifies [Plaintiff] from any loss, including any actual, consequential, incidental or other damage . . . incurred by [Plaintiff] as a result of, or arising out of, the breach of any covenants, warranties or representations

. . . made by Debtor or Indemnitor to [Plaintiff].”); *Major's Furniture Mart, Inc.*, 602 F.2d at 545 (holding the financial transaction was a loan and not a sale when considering allocation of risk and obligation imposed to “indemnify [purchaser] out of a reserve account for losses resulting from a customer's failure to pay”).

This Court's present conclusion is not unique. Multiple courts have held that where an agreement contains recourse and repayment requirements, the purchaser withholds a portion of the principle as a reserve, and an indemnification agreement protects the purchaser from loss, the agreement is a loan, and not a sale. *See Gen. Cap. Corp.*, 212 So.2d at 375 (holding transaction was a loan and not a sale where contract required all assigned commercial paper would be endorsed with full recourse to purchaser, requiring seller to “‘repurchase any note or trade acceptance after default by the maker thereof’ and provided for the ‘deduction of a reserve,’ to which [purchaser] would have recourse in the event [seller] ‘failed to perform a condition of the contract’.”); *W.B. Dunn Co., Inc.*, 275 So.2d at 313 (holding that transactions were loans and not sales of installment contracts); *Milana v. Credit Discount Co.*, 27 Cal. 2d 335, 338-340 (Cal. 1945) (holding that transaction in which accounts receivable were sold at a discount was a loan where seller guaranteed the payment of the accounts within sixty days and was required to purchase those not paid within such a period); *Union Sec., Inc. v. Merchants Trust & Sav. Co.*, 205 Ind. 127, 153 (Ind. 1933) (transaction deemed a loan where Assignee would advance 88% of the face value of the accounts assigned, pay over an additional 10% when the accounts should be paid, and keep 2% as profit).

Plaintiff argues that the parties entered into a factoring agreement, not a loan agreement. *See* ECF No. 184-1, at 31-37; ECF No. 187, at 4 (“The parties' practices, negotiations, and understanding leading up to the execution of the Factoring Agreement demonstrate that the Parties' intent was to enter into a factoring relationship.”). Plaintiff asserts that courts determining whether

a financial agreement is a loan or a sale should adopt a totality of the circumstances approach. ECF No. 184-1, at 33. Yet, Plaintiff fails to provide case law analyzing Florida's usury statute in support of this argument, instead citing cases from federal courts in New York and Illinois, applying New York state law and federal bankruptcy statutes. *Id.*

Plaintiff also contends that the plain language and unambiguous terms of the Agreement indicate that it is a sale, not a loan. ECF No. 184-1, at 34. However, Florida law is clear that courts must look beyond the form of the transaction to determine whether a financial agreement is a sale or a loan. *See Pinchuck v. Canzoneri*, 920 So.2d 713, 715-16 (Fla. Dist. Ct. App. 2006) ("the concealment of the needle of usury in a haystack of subterfuge will not avail to prevent its pricking the body of law into action").

Plaintiff further argues that the transaction is not a loan because the "Reserve Account" was merely a "bookkeeping account" and, only in the event of default, may Plaintiff suspend payments to Defendant Brigade from the Reserve Account. ECF No. 187, at 5-6. Plaintiff's argument overlooks that courts have held that agreements centering around reserve accounts may be considered loans. *See Gen. Cap. Corp.*, 212 So.2d at 375 (holding transaction was a loan and not a sale where contract provided for the "deduction of a reserve, to which [purchaser] would have recourse in the event [seller] failed to perform a condition of the contract") (quotations omitted); *Major's Furniture Mart, Inc.*, 602 F.2d at 546 (holding the financial transaction is a loan and not a sale where it "imposed an obligation to indemnify [purchaser] out of a reserve account for losses resulting from a customer's failure to pay"). Plaintiff's argument seeks to elevate form over substance. No matter the form that recourse may take, the critical concern is that Plaintiff is able to take significant action against Defendant in case of non-payment. Regardless, Plaintiff's

many other sources of recourse unrelated to the Reserve Account, as well as the other factors above, lead to only one conclusion: that the Agreement is a loan, and not a sale, as a matter of law.

**B. The Agreement Does Not Allow Plaintiff to Charge Interest at a Rate Greater than Florida Law Allows.**

Plaintiff argues, consistent with Florida law, that the interest rate charged is well below the legal limit, asserting that the late charges, over advance fees, and collateral management fee should not be considered part of the effective interest rate. ECF No. 184-1, at 38.

Florida Statutes provide that a contract is usurious if the effective interest rate exceeds 18% per annum for loans under $500,000 and is criminally usurious for any loan with an effective interest rate that exceeds 25% per annum. Fla. Stat. §§§ 687.02(1), 687.03(1), 687.071. Section 687.03 explains that charging interest, for usury purposes, can occur "either directly or indirectly, by way of commission for advances, discounts, or exchange, or by any contract, contrivance, or device whatever whereby the debtor is required or obligated to pay a sum of money greater than the actual principal sum received." Fla. Stat. § 687.03(1). The actual principal sum is the "actual amount of money which the lender turns over to the borrower when the note is signed and the loan completed." *Rollins v. Odom*, 519 So.2d 652, 656 (Fla. Dist. Ct. App. 1988) (citing *Wilson v. Conner*, 142 So. 606, 607 (Fla. 1932)). "One does not have to specifically charge interest for there to be usury." *Oregrund Ltd. P'ship*, 873 So.2d at 457 (*citing American Acceptance Corp. v. Schoenthaler,* 391 F.2d 64 (5th Cir. 1968) (Florida law)); *see also Matter of Mickler*, 50 B.R. 818, 829 (Bankr. M.D. Fla. 1985) ("a 'bonus' exacted in connection with financing may be regarded as interest") (*citing Conner Air Lines v. Aviation Credit Corp.,* 280 F.2d 895 (5th Cir. 1960)). In *St. Petersburg Bank & Trust Co. v. Hamm*, the Florida Supreme Court held that section 687.03(3) is clear on its face and should be applied in the following manner:

1. The spreading of any such advance or forbearance for the purpose of computing the rate of interest shall be calculated by first computing the advance or forbearance as a percentage of the total stated amount of the loan. . . .

2. This percentage rate shall then be divided by the number of years, and fractions thereof, of the loan according to its stated maturity date, without regard to early maturity in the event of default. . . .

3. The resulting annual percentage rate shall then be added to the stated annual percentage rate of interest to produce the effective rate of interest for purposes of this chapter. . . .

414 So.2d 1071, 1072-73 (Fla. 1982).

The Agreement encompasses multiple distinct charges relevant to the dispute between the parties. The Agreement's stated loan amount is $1,500,000. ECF No 183-2, at 11; ECF No. 183-3, at 4. Section 5 of the Agreement authorizes Plaintiff to charge at least a 9.75% factoring fee, comprised of the floating prime rate plus 4.5%. ECF No. 183-3, at 2, 5. Additionally, Section 1.15 authorizes Plaintiff to charge Defendant Brigade 1% for each ten-day period beyond the initial ninety days that a payment is due but remains unpaid. ECF No. 183-2, at 10-11; ECF No. 183-3, at 2. Under Florida's spreading statute, multiplying the seventy-one invoices by 1% for each ten-day period the invoice was outstanding greater than ninety days, and dividing that product by the stated loan amount, and then dividing this quotient by the loan term of two years results in a 27.02% effective annualized interest rate for charged late fees. ECF No. 183-2, at 11; ECF No. 183-6. The parties disagree over whether late fees can be considered when determining the applicable interest rate.[2] ECF No. 183-2, at 10-11; ECF No. 184-1, at 38-39.

[2] Plaintiff also takes issue with Defendant Bethell's calculation of interest. *See* ECF No. 187, at 7 ("Bethell's after-the-fact (now fifth) attempt to reconstruct his usury calculation continues to ignore the applicable law on the calculation of interest for usury under Florida law and the undisputed facts."). The Court need not ultimately resolve this issue for even using Defendant's calculations, as discussed below, Defendant cannot prevail.

Under § 687.03(3), "the rate of interest on any loan . . . shall be determined and computed upon the assumption that the debt will be paid according to the agreed terms, whether or not said . . . obligation is paid or collected by court action prior to its term[.]" Fla. Stat. § 687.03(3). As a result, courts applying Florida law have generally held late fees may not be considered when determining whether an interest rate is usurious. *See Fernandez v. Manning Bldg. Supplies, Inc.*, 279 So.3d 349, 351 (Fla. Dist. Ct. App. 2019) (holding that the trial court erred in assessing a late payment fee as a finance charge to be included in the interest rate); *Connecticut Mut. Life Ins. Co. v. Fisher*, 165 So. 2d 182, 184 (Fla. Dist. Ct. App. 1964) ("Clearly, as to principal, the provision for payment of interest at 10% per annum after maturity did not infect the transaction with usury, as it only designated a different rate of interest to be paid after maturity than the rate payable for the time prior to maturity"); *see also Benson v. First Trust & Savings Bank*, 134 So. 493, 496 (Fla. 1931) ("if the loan runs for its full term as agreed on, [and the interest] will not equal or exceed 25 per centum per annum, the legal consequences of such an arrangement must be tested by the results contemplated by the parties on the assumption that both lender and borrower will fully carry out their agreement rather than the special results which may follow, but are not necessarily certain to ensue, when the borrower breaches a covenant"); *In re 8699 Biscayne, LLC*, 465 B.R. 901 (Bankr. S.D. Fla. 2011) ("based upon the relevant Florida case law and related persuasive treatises and supplemental authorities, the "pre-payment penalty clause" under the Loan herein cannot be permitted to influence the usury calculations undertaken by this Court as to the Loan's effective interest rate at inception."); *In re Sundale, Ltd.*, 410 B.R. 101 (Bankr. S.D. Fla. 2009) ("Florida law expressly recognizes a lender's right to charge default interest if the underlying loan documents so provide."). Although, courts in other jurisdictions have held to the contrary and were the Court writing on a blank slate it may find the same, this is not the case here. *See*

*Greenwood Trust Co. v. Com. Of Mass.*, 971 F.2d 818, 825 (1st Cir. 1992) ("a late fee is sufficiently related to the use or forbearance of money, or . . . damages for its detention that it can appropriately be classified as "interest.") (internal quotation marks omitted); *Tikkanen v. Citibank (South Dakota) N.A.*, 801 F. Supp. 270, 278 (D. Minn. 1992) (holding that late fees may be considered when determining the applicable interest rate).

Defendants' responses to Plaintiff's arguments on this point are modest, at best. Defendants' Opposition to Plaintiff's Motion for Summary Judgement fails to address the caselaw above or cite any precedent in support of its position. ECF No. 188. Defendant Bethell's affirmative Motion for Summary Judgment fails in this same way. ECF No. 183. Defendant Bethell cites two cases in its Reply in Support of its Motion for Summary Judgment for the general proposition that "nature of a contract depends upon the liability of the borrower under its terms, or, to put it another way, upon what may be demanded of the borrower, under the terms of the contract, rather than what is demanded from him." ECF No. 190, at 4 (quoting *World O World Corporation*, 306 So. 3d at 1046 (internal citations and quotation marks omitted); *Oregrund Ltd. Partnership*, 873 So. 2d at 457). However, neither of the cases Defendant cites applied this maxim to hold that late fees should be considered when calculating the applicable interest rate. Rather, it has been understood to support the proposition that "an otherwise non-usurious loan does not become usurious merely because usurious interest is claimed or demanded under it." *McTigue v. Am. Sav. & Loan Ass'n of Florida*, 344 So. 2d 254, 256 (Fla. Dist. Ct. App. 1977).

The exclusion of the late fees and any other fees triggered in case of non-compliance essentially settles the matter. Plaintiff argues that the over advance fees should not be considered when determining the applicable interest rate because they are not part of the Agreement and came into existence throughout the parties' course of dealing "when Brigade needed additional funds

but did not have invoices to sell to Aegis or availability under the Amendment." ECF No. 184-1, at 40. Defendants fail to address this argument in Bethell's Motion for Summary Judgment, ECF No. 183-2, Defendants' Opposition to Plaintiff's Motion for Summary Judgment, ECF No. 188, at 3, and Defendant Bethell's Reply in Support of his Motion for Summary Judgment, ECF No. 190, at 4-5. However, they concede the course of dealing that led to Plaintiff's charging of fees. *See* ECF No. 188, at 7 ("Aegis was not threatening to default Brigade – in fact, it was looking to continue to lend money and just bump up the rate even higher."); ECF No. 190, at 8 ("While the late charges were authorized by the Agreement, over-advance fees were not. Over-advance charges and over-advance fees were wholly separate from and not contemplated by and not included in the Agreement."). Likewise, Plaintiff argues that the collateral management fee should not be included in the effective interest rate. ECF No. 184-1, at 40-41 ("The Collateral Management Fee is a separate service charge that compensates Aegis for providing distinctly valuable factoring-related services to Brigade, for collecting, managing and tracking accounts receivable, processing invoices, paying rebates to Brigade"). Defendant Bethell again fails to meaningfully engage with Plaintiff's argument, beyond citing to Section 5.5 of the Agreement, which authorizes Plaintiff to charge a one-half percent collateral management fee on the first day of each month – amounting to an annual rate of 6%. ECF No. 188, at 5. Ultimately, the Court need not resolve these disputes. Even were the 6% collateral management fee and the 3.505% over advance fee added to the 9.75% "factoring fee" it would not exceed the 25% threshold. *See* ECF No. 184-3, at 7 (totaling all non-contingent fees, excluding those triggered by non-compliance, to reach a sum of 20.644%); ECF No. 188, at 3 (conceding that even if the over advance fees are included "Aegis charged interest rates of 11.139%, plus additional "collateral

management fees" and "over advance fees" which brought the effective interest rate of the Agreement to 20.644%").

## II. Defendant Brigade's Counterclaims Must Fail.

Plaintiff's Motion for Summary Judgment shall be granted as to Defendant Brigade's Counterclaims. Maryland law governs Defendant Brigade's tort counterclaims. As explained below, Plaintiff could not have committed conversion because Plaintiff's perfected security interest in any consignment inventory was superior to that of any other party. Defendant's counterclaims for breach of contract and tortious interference are based upon the premise that Plaintiff committed conversion and, therefore, must fail as well.

### A. Maryland Law Applies to Defendant Brigade's Counterclaims.

In Response to Plaintiff's Motion for Summary Judgment, Defendant Bethell seeks to apply Florida law without addressing Plaintiff's arguments that Maryland law should govern Defendant Brigade's tort counterclaims. ECF No. 188. "In the Fourth Circuit, courts may apply [contractual] choice of law provisions that are 'sufficiently broad to encompass contract-related tort claims,' . . . to non-contract claims." *Bresler v. Wilmington Trust Co.*, 348 F.Supp.3d 473, 488 n. 10 (D. Md. 2018) (citing *Hitachi Credit Am. Corp. v. Signet Bank*, 166 F.3d 614, 628 (4th Cir. 1999)). Under Maryland law, courts look to the intent of the parties as reflected by the plain language of the contract to determine whether a choice of law provision applies to contract related tort claims. *Superior Bank, F.S.B. v. Tandem Nat. Mortg. Inc.*, 197 F.Supp.2d 298, 309 (D. Md. 2000) (citing *Kronovet v. Lipchin*, 415 A.2d 1096, 1104 (Md. 1980)).

The Agreement's choice of law provision provides for the application of Florida law to the contract itself, but does not include the broad "arising out of or related to" language that would bring contract-related tort claims under its purview. ECF No. 183-3, at 11 ("This Agreement and

all transactions contemplated hereunder and/or evidenced hereby shall be governed by, construed under, and enforced in accordance with the internal laws of the State of Florida, United States."); *see Felichko v. Schechter*, No. RDB-18-1392, 2019 WL 1318109, at *9 (D. Md. Mar. 22, 2019) (declining to apply a contractual choice-of-law provision to the torts of fraud and negligent misrepresentation because "the Option Agreement provides for the application of Delaware law to the contract itself, but it does not contain the broad 'arising out of or related to' language that would encapsulate contract-related tort claims"); *Jones v. Koons Auto., Inc.*, No. DKC-09-3362, 2013 WL 3713845, at *6 (D. Md. July 15, 2013) (declining to apply a contractual choice-of-law provision to various tort claims because this provision applied only to the contract and lacked language suggesting related disputes would be evaluated under the provision); *Superior Bank, F.S.B. v. Tandem Nat. Mortg., Inc.*, 197 F. Supp. 2d 298, 309 (D. Md. 2000) (declining to apply a contractual choice-of-law provision to fraud and negligent misrepresentation claims because the intent of the parties evidenced in the "plain language of the contract" was not to include "tort claims that are merely related to the contract").

Maryland law governs Defendant Brigade's tort counterclaims.[3] A federal district court sitting in diversity jurisdiction—as the Court is here—must apply "the choice of law rules of the forum state."[4] *Ground Zero Museum Workshop v. Wilson*, 813 F. Supp. 2d 678, 696 (D. Md.

---

[3] This Court previously held that "there does not appear to be a material difference between Florida and Maryland conversion law." ECF No. 122, at 8.

[4] The Court possesses diversity jurisdiction because there is complete diversity of the parties: Plaintiff is a limited liability company organized under the laws of the State of Florida, Defendant Brigade is a corporation organized under the laws of the State of Delaware, with its principal place of business in the state of New York, and Defendant Bethell is a domiciliary of the State of New York. 28 U.S.C. §1332(a); ECF No. 1, at 3. Further, the amount in controversy exceeds the $75,000 requirement. 28 U.S.C. § 1332(a); ECF No. 1, at 4.

2011). In this case, the forum state is Maryland. Under Maryland law, "tort claims are governed by the law of the state where the alleged harm occurred ('*lex loci delicto*')." *Danner v. Int'l Freight Sys. of Wa., LLC*, 855 F. Supp. 2d 433, 447 (D. Md. 2012) (citing *Proctor v. WMATA*, 990 A.2d 1048, 1068 (Md. 2010)). The record in this case indicates that the harm—the consignment of inventory—occurred in a warehouse in Maryland; accordingly, the Court applies Maryland law. ECF No. 184-1, at 44; ECF No. 184-2, at 13, 18-19.

**B. Defendant Brigade's Counterclaim for Conversion Fails.**

Defendant Bethell argues that Defendant Brigade's counterclaim for conversion prevails because Plaintiff's security interest was subordinate to that of the consignor. ECF No. 188, at 8.

Conversion is "a physical act of ownership or dominion over a person's property combined with the intent to exert such ownership or control over the property, regardless of whether they are doing so in good faith." *In re Reecher*, 514 B.R. 136, 158 (Bankr. D. Md. 2014). In Maryland, a security agreement is effective according to its terms between the parties, against purchasers of the collateral, and against creditors. Md. Code Ann., Com. Law § 9-201(a). As for consignments, UCC Article 9 further specifies: "Consignment means a transaction, regardless of its form, in which a person delivers goods to a merchant for the purpose of sale and:

> (A) The merchant deals in goods of that kind under a name other than the name of the person making delivery; is not an auctioneer; and is not generally known by its creditors to be substantially engaged in selling the goods of others;
>
> (B) With respect to each delivery, the aggregate value of the goods is $1,000 or more at the time of delivery;
>
> (C) The goods are not consumer goods immediately before delivery; and
>
> (D) The transaction does not create a security interest that secures an obligation.

U.C.C. § 9-102(a)(20) (omitting internal subheadings).

When there are competing secured claims to the same collateral, the following priority rules apply:

> (1) Conflicting perfected security interests and agricultural liens rank according to priority in time of filing or perfection. Priority dates from the earlier of the time a filing covering the collateral is first made or the security interest or agricultural lien is first perfected, if there is no period thereafter when there is neither filing nor perfection.
>
> (2) A perfected security interest or agricultural lien has priority over a conflicting unperfected security interest or agricultural lien.
>
> (3) The first security interest or agricultural lien to attach or become effective has priority if conflicting security interests and agricultural liens are unperfected.

Md. Code Ann., Com. Law § 9-322. "[W]hen there are competing security interests, the first to attach has priority, and the holder of a perfected security interest generally has priority over a conflicting, unperfected security interest." *Berkheimer v. Test*, No. 2170, 2019 WL 3385186, at *14 (Ct. Spec. App. Md. July 26, 2019). Under § 9–308(a) of Maryland's Commercial Law Article, a security interest is perfected if it has attached and the applicable requirements for perfection in §§ 9–310 through 9–316 have been satisfied, including the filing of a financing statement. Md. Code Ann., Com. Law § 9–308(a).

As a matter of law, Plaintiff's perfected security interest takes priority over the subsequent consignor with an unperfected security interest. ECF No. 184-1, at 44. Plaintiff has a first priority lien on all of Defendant Brigade's assets including any consignment inventory pursuant to section 9 of the Agreement. ECF No. 184-1, at 43-44; ECF No. 188, at 8; ECF No. 183-3, at 2, 7. The purported consignor did not record a financing statement as to the assets, and Defendant Brigade does not dispute that the consignor's security interest was unperfected. ECF No. 184-4, at 202; ECF No. 188, at 8; *see Madison Nat. Bank v. Newrath*, 261 Md. 321, 325 (Md. 1971) (holding that the under the Uniform Commercial Code filing of a financing agreement is a common method of

perfecting a security interest). Pursuant to the general rule that a creditor with a prior perfected security interest trumps a subsequent consignor with an unperfected interest, Plaintiff's security interest was superior to that of any party. *Berkheimer*, 2019 WL 3385186, at *14.

Plaintiff could not have committed conversion because Plaintiff's perfected security interest in any consignment inventory was superior to that of any other party. ECF No. 183-3, at 7; ECF No. 184-1, at 44. In order to bring a claim of conversion, Defendant must maintain an interest in the property. *See Darcars Motors of Silver Spring, Inc. v. Borzym*, 379 Md. 249, 262 (Md. 2004) (holding that an essential element of conversion is the claimant is entitled to possession of the property). Here, Plaintiff's rights to the property are superior to those of Defendant.

Defendant Bethell argues that Plaintiff was on proper notice of the consignment relationship, requiring Plaintiff's security interest to be subordinated to that of the consignor. ECF No. 188, at 8. However, "[g]enerally, whether a secured party had actual notice of a prior security interest is not a relevant consideration in determining priorities" and "knowledge of the consignment arrangement[] does not preclude [the party] from asserting such rights against the consignors." *In re Rusell*, 254 B.R. 138, 140-41 (W.D. Va. 2000). "A perfected security interest . . . has priority over a conflicting unperfected security interest." Md. Code Ann., Com. Law § 9-322(a)(2). Further, § 9–322, which outlines the priority rules for security interests, does not contemplate the impact of notice in disrupting a perfected security interest.

Accordingly, Defendant Brigade's other counterclaims must fail as well. Defendant Brigade's arguments supporting its Breach of Contract Counterclaim and Tortious Interference Counterclaim are both based upon the same "improper repossession of consignment inventory" argument as its Conversion counterclaim. ECF No. 189, at 8; *see* ECF No. 188, at 9 ("Aegis Breached its Contract with Brigade by Seizing Consigned Inventory and Charging Interest Outside

the Agreement"); *see* ECF No. 188, at 9-10 ("Aegis ordered the repossession of Brigade's consignment inventory in Maryland . . . and issued a Notice of Assignment looking to collect for a job Brigade had not yet been awarded").

**CONCLUSION**

For the reasons stated above, it is hereby ORDERED that Plaintiff's Motion for Summary Judgment, ECF No. 184, is granted. For the same reason, Defendant Bethell's Motion for Summary Judgment, ECF No. 183, is denied. Judgment is entered against the Defendants and in favor of Aegis on Plaintiff's Count I (Breach of Contract Against Brigade) and Count II (Breach of Contract Against Bethell) as asserted in its Second Amended Complaint, ECF No. 85, in the amount of $1,690,268.10; and it is further ORDERED, that the interpleaded funds shall be released to Aegis pursuant to the Stipulation and Order Resolving Claims Between United States of America and Aegis Business. The case shall be closed.

A separate implementing Order shall follow.

Date: September 18, 2026

/s/
Ajmel A. Quereshi
United States Magistrate Judge